420 S.E.2d 727

**O'MARA ENTERPRISES, INC.,**
Plaintiff Below, Appellant,

v.

**PEOPLE'S BANK OF WEIRTON,**
Lowndes Bank, Parkersburg National
Bank, First National Bank of Morgan-
town, and the Suncrest National Bank,
Defendants and Third–Party Plaintiffs
Below, Appellees,

v.

**BANK ONE, STEUBENVILLE, N.A.,**
Third–Party Defendant Below,
Appellee.

No. 20080.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 15, 1992.

Decided June 11, 1992.

Rehearing Denied July 21, 1992.

William T. Fahey, Hinerman & Fahey, Weirton, James C. Carpenter, Carlile, Patchen & Murphy, Columbus, Ohio, for appellant.

Dominic J. Bianco, Robert P. Fitzsimmons, Fitzsimmons & Parsons, Wheeling, for All Banks.

WORKMAN, Justice:

Appellant O'Mara Enterprises, Inc. ("O'Mara") appeals from an adverse summary judgment ruling entered by the Circuit Court of Hancock County in favor of the appellee banks on the issue of alleged wrongful payment of deposited checks. An embezzlement scheme perpetrated on O'Mara by its controller resulted in O'Mara's loss of more than $41,000.[1] The funds, had they not been embezzled, were intended by O'Mara as payment of its weekly federal withholding tax obligation. Through the use of a restrictive endorsement, O'Mara's controller deposited the tax checks into the personal account of the Gail Smith Development Company ("GSD"). Appellant contends that the tax checks were wrongly accepted for deposit into the GSD account and further that the drawee banks which honored those checks are liable to O'Mara for transferring such funds because the restrictive endorsement prevented the checks from being properly payable pursuant to the Uniform Commercial Code, West Virginia Code §§ 46-1-101 to 46-11-108 (1966 & Supp.1991) [hereinafter "UCC"], provisions on negotiability. We agree with appellant's position and accordingly reverse the summary judgment granted in favor of the appellee banks by the circuit court and find that summary judgment should have been entered in favor of O'Mara.

O'Mara, a West Virginia Corporation which has its principal place of business in Steubenville, Ohio, operates fifteen Bonanza restaurants at locations in West Virginia, Ohio, and Pennsylvania. O'Mara employed GSD to manage its accounting and other financial matters. Included among the services provided by GSD to O'Mara was the calculation of O'Mara's weekly federal withholding taxes, preparation of checks for deposit for O'Mara's withholding taxes, and reconciliation of O'Mara's checking accounts with monthly bank statements. Until June of 1979, Gail Smith was the sole owner of GSD and he was also the president/chairman and twenty percent owner of O'Mara.[2]

The controller for both O'Mara and GSD was Terry Thompson. As O'Mara's controller, Mr. Thompson handled the payment of O'Mara's federal payroll taxes. In September 1978, Heritage Bank, (the "Ohio Bank" or "Bank"),[3] the bank where GSD deposited funds on behalf of O'Mara for the payment of O'Mara's taxes, instituted a new policy requiring all tax deposit checks to be made payable to the Bank itself (i.e. Pay to the Order of Heritage Bank).[4]

Beginning in 1979, Gail Smith's corporate interests that were unrelated to O'Mara began to suffer cash flow problems. Gail Smith and Terry Thompson purportedly de-

---

1. The total amount of funds actually embezzled from O'Mara exceeded $425,000. Of that amount, $41,397.67 was embezzled from O'Mara's checking accounts in West Virginia. Only the West Virginia losses are at issue in this case.

2. In June of 1979, Timothy O'Mara became president of O'Mara.

3. Heritage Bank is now called Bank One and was previously known as The First National Bank & Trust of Steubenville. Given the various names by which this particular bank has been identified, we will refer to this bank as the Ohio Bank to avoid unnecessary confusion.

4. Previously, the Ohio Bank had accepted treasury tax account checks drawn on other banks.

vised a scheme to embezzle O'Mara's federal withholding tax payments and divert those funds into Mr. Smith's personal account, the GSD account, at the Ohio Bank. The scheme worked as follows: every week when O'Mara's withholding taxes were calculated, GSD employees would prepare the checks payable to the order of the Ohio Bank and the checks were then given to Mr. Thompson. Before taking the tax checks to the Bank for deposit, Mr. Thompson would stamp the following language on the back of each check:

Pay to the Order of

The First National Bank & Trust Company

in Steubenville, Ohio

FOR DEPOSIT ONLY

GAIL SMITH DEVELOPMENT

# 009–9215

W. Gail Smith

Mr. Thompson would then proceed to the Bank with the O'Mara tax checks in hand as well as checks prepared by GSD on O'Mara's funds to pay GSD for the accounting services it provided to O'Mara. The latter checks were drawn "Pay to the Order of GSD." Mr. Thompson presented both types of checks for deposit into the GSD account. The tellers at the Ohio Bank accepted the tax checks for deposit into the GSD account without any inquiry. Through this scheme, $41,370.67 worth of funds intended to pay for O'Mara's federal withholding taxes were diverted to the GSD account. It is undisputed that O'Mara never authorized, approved, or directed the deposit of any of the tax checks in question into the GSD account.

All of the tax checks deposited by Mr. Thompson at the Ohio Bank were drawn by O'Mara on its checking accounts with the appellee West Virginia banks. Each of the checks was drawn Payable to the Order of Ohio Bank and was signed by Timothy J. O'Mara, O'Mara's president, by means of a facsimile signature stamp. None of the checks were altered in any manner. Through the normal bank collection process, the tax checks were ultimately routed to the appellee West Virginia banks upon which the funds had been drawn.

The West Virginia banks honored the checks by debiting O'Mara's respective checking accounts.

Another fact pertinent to this appeal is the execution by O'Mara on September 13, 1976, of a preprinted corporate resolution form upon the opening of its checking account at the Ohio Bank. This form, which the Bank required O'Mara to sign, states that the

... Bank is hereby authorized to honor and pay all such instruments so drawn [with the signature of O'Mara's president or GSD's president, Gail Smith] ... without inquiry as to the circumstances of their issue or the disposition of their proceeds ... when the same is signed or endorsed in the manner above indicated, whether such instrument is payable to this Company [O'Mara], to bearer, to said Bank or otherwise.

Appellees, in reliance on this corporate resolution, argue that the Ohio Bank was exculpated from any duty to pay checks only in accordance with the drawer's instructions. Their position is essentially that the Bank, based on the resolution, was entitled to treat the tax checks as "bearer" rather than "order" instruments. *See* W.Va.Code §§ 46–3–110, –111.

The procedural history of this case began in 1982 when O'Mara instituted a civil action in the Circuit Court of Hancock County alleging that the appellee West Virginia banks had breached their customer checking account contracts with O'Mara and violated UCC provisions by honoring the tax checks at issue. O'Mara contends that because these checks were not properly payable (i.e. they were made payable to the Ohio Bank and yet were deposited into the GSD account), the appellee banks improperly honored those checks. The West Virginia banks filed a third-party complaint against the Ohio Bank on the theory that if they were liable as the drawee banks to O'Mara, the Ohio Bank was liable under the theory of UCC transfer warranties. *See* W.Va.Code § 46–4–207.

O'Mara filed its summary judgment motion against the appellee banks on June 20, 1988. The Ohio Bank later sought sum-

mary judgment against O'Mara on October 10, 1989. In its ruling entered on September 19, 1990, the trial court granted summary judgment to the Ohio Bank. It is from that adverse summary judgment ruling that appellant now appeals to this Court.

In its memorandum opinion granting summary judgment to the appellee banks, the trial court cited the rule that payment of a check not properly endorsed normally results in the drawee bank being held strictly liable to its customer. Citing the apparent authority exception to this rule, the circuit court concluded rather summarily that O'Mara "had clothed his agents, Terry Thompson and Gail Smith, with apparent and actual authority to receive the proceeds of a check...." *See* 10 Am. Jur.2d *Banks* § 560 (1963); *Johnstown Mfg., Inc. v. Haynes*, 53 Ohio App.3d 42, 557 N.E.2d 1221 (1988). The court relied on the corporate resolution to support its position that the Bank had actual authority to deposit the tax funds into the GSD account. With regard to apparent authority, the trial court in its findings of fact noted that "Terry Thompson, who normally presented the checks, was well known by the tellers and was generally believed to be the 'acting agent' for plaintiff [O'Mara] and other companies managed by the Gail Smith Development Company." The trial court ultimately concluded that O'Mara should bear the responsibility for the losses it sustained from the embezzlement scheme by reasoning that O'Mara "gave life to a banking procedure [the corporate resolution form] that resulted in its loss."

■ The reasoning of the circuit court is flawed in several respects: First and foremost, we disagree with the trial court's conclusion that "the checks did contain the proper chain of indorsement...." Each of the checks at issue was drawn "Pay to the Order of the Ohio Bank." Prior to any endorsement by the Ohio Bank, however, Mr. Thompson placed a restrictive endorsement on the back of the checks stating "Pay to the Order of GSD." The UCC cogently addresses the issue of endorsements: "If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; ..." W.Va.Code § 46–3–202(1). "Negotiation takes effect only when the indorsement is made...." W.Va.Code § 46–3–201(3). The UCC requires that a check which is drawn "Pay to the Order of Ohio Bank" must be properly endorsed by the named payee (e.g. Ohio Bank) to be negotiable. A restrictive endorsement that precedes the endorsement required by the named payee on a check drawn "Pay to the Order of" prevents the commercial instrument from being negotiable pursuant to the provisions of the UCC. Accordingly, to preserve negotiability, a restrictive endorsement can only *follow* the endorsement intended by the check's drawer.

■ It is axiomatic that absent negotiability, there is no transfer of rights to the funds represented by the commercial instrument. Since the checks were not negotiable because of non-compliance with UCC provisions regarding endorsement, the rights to the funds represented by the checks at issue were never transferred to the Bank. The Bank, therefore, became only a possessor of the checks and not a holder. *See* W.Va.Code § 46–1–201(20). Absent the necessary holder status required by the UCC to transfer rights in a commercial instrument, the Bank was not entitled to collect the funds at issue from the West Virginia banks upon which the tax checks were drawn. *See* W.Va.Code §§ 46–3–301; *see also O'Mara Enters., Inc. v. Mellon Bank*, 601 F.Supp. 565, 571 (W.D.Pa.1985) ("because of GSD's indorsement, Heritage [Bank] did not become a holder, notwithstanding that the checks were originally payable to Heritage's order"). By placing a restrictive endorsement on checks drawn "Pay to the Order of Ohio Bank" which preceded endorsement by the named payee, the checks became non-negotiable pursuant to the UCC provisions.

■ To conclude that the tax checks were properly endorsed, the circuit court relied on O'Mara's execution of the corporate resolution form. Adopting the reasoning set forth in *Master Chemical Corp. v.*

*Inkrott,* 55 Ohio St.3d 23, 563 N.E.2d 26 (1990), we conclude that it is "commercially unjustifiable" for a bank, in reliance on a preprinted corporate resolution form, to treat checks drawn "Pay to the Order of" as bearer paper rather than order instruments. *Id.,* 563 N.E.2d at 31; *see* W.Va. Code §§ 46–3–110, –111. The court in *Master Chemical* explained that

> courts across the country have found uniformly that when a check is drawn to the order of a bank, the drawer has indicated his intention to place the funds in the bank's custody. Annotation, Liability of Bank for Diversion to Benefit of Presenter or Third Party of Proceeds of Check Drawn to Bank's Order by Drawer not Indebted to Bank (1989), 69 A.L.R. 4th 778, 801. The bank is not entitled to treat the checks as bearer paper. (See UCC 3–110 and 3–111.) *Once the payee bank accepts custody and control of the funds, it can justify dispensing the funds only in compliance with the instructions of the drawer.* Annotation, *supra,* at 802. *If the payee bank assumes, without investigation, that the instructions of the presenter are those of the drawer, the payee bank does so at the risk of discovering that no such directions were given by the drawer.* The payee bank becomes liable for the misdirected funds.

563 N.E.2d at 28–29 (emphasis supplied).

■ Pursuant to a factual scenario analogous to that of this case, the controller for *Master Chemical* deposited checks drawn payable to the depository bank[5] and intended as tax payments into a corporate bank account which he controlled. Relying on the language of a corporate resolution identical in all material aspects to the one executed by O'Mara,[6] the trial court in *Master Chemical* determined that the cor-

poration, by executing the resolution, "had contractually altered the bank's obligations under the UCC." 563 N.E.2d at 28. The Ohio Supreme Court found, however, first that the resolution "cannot be construed to encompass the present situation where the check is drawn to the order of a bank to which the drawer is not indebted. Here, the bank is authorized to pay the funds only to those persons specified by the drawer." *Id.* The Court also determined in *Master Chemical* that the resolution improperly attempted to negate the bank's responsibility to exercise good faith and ordinary care with respect to its customer. *Id.* (referencing UCC 4–103 [W.Va.Code § 46–4–103]).

■ We concur with the Court's reasoning in *Master Chemical* concerning the use of preprinted corporate resolutions:

> Toledo Trust ... established a procedure where a transfer from one corporate account to another would be presumed correct and would not be questioned. In an age of white-collar crime, it is more than negligent for a bank to make such a presumption in the development of its policies when dealing with fiduciaries presenting checks payable to the bank.... The bank by its policies and presumptions lent itself to Inkrott's [controller] embezzlement.
>
> ... We believe that it is commercially unjustifiable for Toledo Trust to institute a procedure permitting this type of theft to occur. Toledo Trust has attempted to contract away its bad-faith liability for creating a procedure designed to promote its own self-interest in derogation of the Uniform Commercial Code....

563 N.E.2d at 31.

Quite simply, a bank cannot, through the use of a preprinted corporate resolution

---

**5.** The controller in *Master Chemical* also altered the amounts of the three checks he utilized to execute his embezzlement scheme. *See* 563 N.E.2d at 27.

**6.** The pertinent language of the corporate resolution executed in *Master Chemical* states that:

'Said depository of the funds of this Corporation is hereby authorized to pay such checks, drafts, notes or orders and also to receive the same for the credit of or in pay-

ment from the payee or any other holder, when so signed, without inquiry as to the circumstances of their issue or the disposition of their proceeds whether drawn to the individual order of or tendered in payment of individual obligations of the said above named officers of other authorized persons of this corporation or otherwise, ...'

563 N.E.2d at 28.

form, negate its UCC responsibilities to exercise good faith and ordinary care with respect to its customers. *See* W.Va.Code § 46–4–103. By ignoring the "order" designation of the tax checks at issue and treating the same as bearer paper, the Bank clearly acted in derogation of its UCC responsibilities. *See Master Chemical,* 563 N.E.2d at 31; W.Va.Code §§ 46–3–110, –111. Accordingly, the time-honored principles of strict liability which underlie the UCC mandate that the Ohio Bank, rather than the West Virginia banks, is the proper party to bear responsibility for the funds which Mr. Thompson wrongly directed to the GSD account.

Based on the foregoing opinion, the decision of the Circuit Court of Hancock County is hereby reversed.

Reversed.