WATSEKA FIRST NATIONAL BANK, Plaintiff and Counterdefendant-Appellee, v. HENRY HORNEY *et al.*, Defendant and Counterplaintiff-Appellant.

Third District    No. 3—95—0897

Opinion filed October 10, 1997.—Rehearing denied December 3, 1997.

Paul J. Bargiel (argued), of Chicago, and Joseph J. Walczak, of Orland Park, for appellant.

Frank J. Simutis (argued), of Ackman, Marek, Boyd & Simutis, Ltd., of Watseka, for appellee.

JUSTICE SLATER delivered the opinion of the court:

On January 16, 1992, Watseka First National Bank (Bank) was granted confession judgment on a note in the amount of $196,842.47 against Henry Horney and William Walker. Horney and Walker were part owners of EZ Pickins, a retail grocery store in Watseka that declared bankruptcy in December 1991. Horney and Walker were co-signers on the promissory note. The court denied Horney's subsequent motion to open judgment, but allowed the filing of Horney's counterclaim and stayed the judgment pending disposition of the counterclaim. In his verified answer, Horney admitted execution of the note but claimed a setoff in an amount exceeding the Bank's claims. Horney claimed he sustained a $1.1 million loss as a result of the Bank's negligence and failure to use ordinary care. Horney alleged his right to sue the Bank for EZ Pickins' loss arises from an oral assignment.

On May 9, 1995, the court heard evidence on Horney's counterclaim and continued the case for disposition. Written posttrial arguments were filed by both parties. The Bank also filed a motion to file a first amended answer and affirmative defenses. Horney objected and argued that the new affirmative defenses should not be permitted because of surprise and prejudice to him, and they did not conform to the proof. In a written memorandum, the court allowed the Bank's motion to file its amended answer and new affirmative defenses, finding no prejudice to Horney. The court further found that the new filings conformed the pleadings to the evidence presented, and it found the issues in favor of the Bank and against Horney, specifically ruling that Horney's claim was unavailable as a setoff against the Bank's judgment or as an independent claim.

Horney filed a motion to vacate judgment and for a new trial, based on assertions of judicial bias. Horney's motion was denied.

On appeal, Horney contends that the Bank breached its contract with EZ Pickins by paying checks to a fictitious payee in violation of explicit instructions requiring two signatures and in contradiction of its own policies and procedures. Specifically, he contends that the Bank's affirmative defenses do not excuse breach of contract or violation of its own policies and procedures.

We find that the lower court's ruling against Horney was not against the manifest weight of the evidence. We find that Horney's counterclaim was barred because it was not timely made. We affirm the decision of the trial court.

## FACTS

The pertinent facts on appeal are as follows: Horney developed a

banking relationship with the Bank in connection with his various businesses and maintained several accounts with the Bank. In 1983, Horney hired a comptroller, Ray Cardinal, to handle significant financial matters and the internal audit work pertaining to Horney's various businesses, including EZ Pickins. Cardinal was entrusted with the duty of receiving canceled checks and reconciling monthly bank statements, but he did not have authority to sign checks. Horney claims he trusted Cardinal absolutely and gave him complete control of the bank statements. Horney did not examine the bank statements from 1983 to 1987, which allowed Cardinal free rein to engage in a scheme of fraud and forgery.

According to Horney, the signature cards on the EZ Pickins accounts required two signatures. In addition, EZ Pickins' corporate resolution filed with the Bank required that all checks or orders for withdrawal of funds should contain two signatures. Although Horney did not formally rescind these instructions to the Bank, evidence adduced at trial clearly showed that Horney and EZ Pickins did not follow their own instructions. The facts showed that Horney was aware that checks were being honored by the Bank bearing only one signature because he himself presented such checks to the Bank. In addition to checks bearing only Horney's signature, many other checks were honored bearing only one of the authorized signatures on file with the Bank or a facsimile of Horney's signature.

Horney discovered Cardinal's forgery scheme on Friday before the Labor Day weekend in 1987. The Bank called to notify him of an overdraft in the amount of approximately $39,000 made out to Charles Fuller. Neither Horney nor Walker recognized the name, but a subsequent search of Cardinal's desk and bank statements revealed many more checks made payable to the fictitious payee totalling approximately $1.1 million. Horney told Walker to advise the Bank of the forgeries, but the Bank has no record of the handwritten note purportedly written by Walker. Other than Walker's purported note to the Bank, Horney does not recall speaking to anyone at the Bank or writing to them about the forgeries after that weekend. The evidence showed that the Bank was not asked to take any action to return the forged checks through normal banking channels.

After discovering the forgeries, Horney continued to do business with the Bank without protest or complaint as to the manner in which checks were handled. Horney renewed the note to the Bank six times and continued to do business as usual with the Bank for another four years. It was not until January 1992, after EZ Pickins filed for bankruptcy relief and the Bank obtained confession judgment on its note, that Horney presented his $1.1 million claim.

## ANALYSIS

Horney contends that the Bank breached its contract with EZ Pickins when it honored checks made payable to a fictitious payee in violation of explicit instructions requiring two signatures on checks and in contradiction of its own policies and procedures. Specifically, Horney contends that the Bank's affirmative defenses do not excuse breach of contract or violation of its own policies and procedures. We do not reach Horney's contentions on their merits, however, because our determination that his claim is barred by the applicable statute of limitations is dispositive.

■ The Illinois Uniform Commercial Code, as it existed during the years involved in this case, provided in pertinent part:

"Customer's Duty to Discover and Report Unauthorized Signature or Alteration. (1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries ***, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

*** his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure ***.
***

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item *** is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration." Ill. Rev. Stat. 1987, ch. 26, par. 4—406.

The committee comments to the Uniform Commercial Code emphasized the onus placed on the customer to discover unauthorized signatures and alterations when it stated that "one of the best ways to keep down losses *** is for the customer to promptly examine his statement and notify the bank of an unauthorized signature or alteration so that the bank will be alerted to stop paying further

items." Ill. Ann. Stat., ch. 26, par. 4—406, Uniform Commercial Code Comments—1963, Comment 3, at 548 (Smith-Hurd 1963). Further, the committee noted that subsection (4) placed "an absolute time limit on the right of a customer to make claim for payment of altered or forged paper without regard to care or lack of care of either the customer or the bank." Ill. Ann. Stat., ch. 26, par. 4—406, Uniform Commercial Code Comments—1963, Comment 5, at 548-49 (Smith-Hurd 1963)).

Horney contends that section 4—406 does not apply because Horney's claims are based upon breach of contract—specifically, the Bank's breach of its written promise to exercise due care contained in the "Depositor's Contract" located on the back of the Bank's signature cards. The proper statute of limitations, Horney argues, provides that actions on written contracts shall be commenced within 10 years after the cause of action accrued. 735 ILCS 5/13—206 (West 1996). We disagree.

■ Where two statutes of limitations arguably apply to the same cause of action, the one which more specifically relates to the action must be applied. *Haddad's of Illinois, Inc. v. Credit Union 1 Credit Union*, 286 Ill. App. 3d 1069, 678 N.E.2d 322 (1997). In holding that the more specific statute of limitations applied, the *Haddad's* court noted the need for finality and certainty in commercial transactions and the fact that the customer is in the best position to detect unauthorized use of its bank account. Despite Horney's attempt to find shelter in the 10-year limitations statute by claiming breach of contract, section 4—406, because of its specificity, takes precedence over the general limitations statute. See *Calumet Country Club v. Roberts Environmental Control Corp.*, 136 Ill. App. 3d 610, 483 N.E.2d 613 (1985). We find that section 4—406 deals specifically with Horney's duty to discover and report unauthorized use of EZ Pickins' accounts and apply it to the case at hand.

Horney also contends that the Bank cannot use section 4—406 as a defense because: (1) the Bank did not exercise reasonable care when it honored checks bearing only one signature and made payable to a fictitious payee, and (2) the Bank did not supply EZ Pickins with a statement of account sufficient to put it on notice that unauthorized checks may have been paid. We disagree with both of these contentions.

First, the plain language of the statute states that the one-year statute of limitations applies without regard to care or lack of care of either the bank or the customer. Ill. Rev. Stat. 1987, ch. 26, par. 4—406(4). Accepted principles of statutory construction dictate that where the language is clear and unambiguous, the plain meaning of

the statute shall be applied. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 678 N.E.2d 1009 (1996). The statute should be evaluated as a whole, with each provision construed in connection with every other section. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 665 N.E.2d 808 (1996).

The language of section 4—406 of the Uniform Commercial Code is clear, unambiguous and logically structured. Subsection (1) outlines the duties of the parties. The bank's duty is to provide or make available to the customer statements of account and the accompanying items. Once the bank has satisfied this duty, it becomes incumbent on the customer to examine such statements to discover unauthorized use and promptly notify the bank. Subsections (2) and (3) address considerations of good faith and ordinary care to assist in the allocation of loss or to determine the preclusion of claims. Subsection (4) makes a clear and unambiguous shift away from considerations of care or lack of care and states that "without regard to care or lack of care of either the customer or the bank," claims against the bank are precluded if the customer failed to discover and report unauthorized items within one year after the customer received the bank statements and accompanying items. Ill. Rev. Stat. 1987, ch. 26, par. 4—406(4).

Evaluating section 4—406 as a whole and applying the plain meaning of subsection (4), we find that more than one year had elapsed from the time that the unauthorized items were made available to Horney. Ill. Rev. Stat. 1987, ch. 26, par. 4—406. The time limitation in subsection (4) is absolute and any discussion of care or lack of care is superfluous.

Horney's second contention that he did not have sufficient notice to discover the unauthorized checks is without merit. Horney never examined the bank statements during 1983 and 1987. The statements sent every month to Cardinal contained cancelled checks. If Horney had examined the cancelled checks, the forgeries would have been readily discoverable. While Horney complains of the fact that check numbers were not included on the bank statements sent each month to Cardinal, there was no requirement during 1983 and 1987 that bank statements include check numbers. It was not until the 1992 amendments to the Uniform Commercial Code that check numbers were required to be supplied to the customer on the bank statements. 810 ILCS 5/4—406(a) (West 1992). When Horney finally did examine the statements in 1987 after discovering Cardinal's fraudulent scheme, he was able to easily identify the forgeries simply by looking at the statements and the cancelled checks. We find that the Bank provided Horney with sufficient notice to discover the

forgeries. Despite this notice, Horney failed to examine the bank statements and discover unauthorized use of the EZ Pickins account.

The last question we address is whether Horney reported the forgeries practiced on the EZ Pickins account. Section 4—406 requires that upon discovery of unauthorized use of an account, the customer must notify the bank promptly. Ill. Rev. Stat. 1987, ch. 26, par. 4—406(1). Horney contends that the Bank did receive notice of the forged checks. Given our holding above, that claims against the Bank are precluded unless they are made within one year after receipt of the bank statements and the cancelled checks, we are obliged to distinguish between claims on checks forged from 1983 to August 1986 and checks forged from August 1986 to Labor Day weekend 1987. There is clearly no evidence of record that Horney reported any checks allegedly forged during the years 1983 through August 1986. In fact, Horney admitted to having first discovered the forgeries on Friday before the Labor Day weekend in 1987. Therefore, any claims against the Bank regarding checks allegedly forged prior to August 1986 are clearly time barred.

With respect to checks forged from August 1986 through Labor Day weekend in 1987, there is a question whether Horney's communications with the Bank constituted sufficient notice of the forgeries. Horney asserts that the handwritten note by Walker referring to a conversation with Luke Montgomery, then vice president of the Bank, constitutes a report to the Bank. Horney also asserts that the conversation he had with the Bank employee who notified him that the account was overdrawn also constitutes notice to the Bank. Other than these two incidences, however, Horney presented no other evidence showing that he fulfilled his duty to report unauthorized use of the EZ Pickins account to the Bank.

In *Knight Communications, Inc. v. Boatmen's National Bank*, 805 S.W.2d 199 (Mo. App. 1991), which involved the customer's failure to report unauthorized signatures, the court held that even if a corporate director had called to inform the bank of wrongly honored checks, it was questionable whether such conversations were deemed to be sufficient notice to the bank. The court noted that the Uniform Commercial Code does not define the word "report" and does not prescribe what would constitute a sufficient report to the bank. *Knight*, 805 S.W.2d 199. Although the *Knight* court declined to decide the degree of specificity required (*Knight*, 805 S.W.2d 199), common sense indicates that the report should be sufficient to at least identify the quantity of checks involved, their amounts, the dates and check numbers, the names of the payees, or any other specific information upon which the bank could have acted.

In the instant case, no evidence was presented showing that the Bank received specific information regarding the forged checks. The conversations of Walker and Horney with Bank employees were devoid of any specific information. Walker's handwritten note simply asks the Bank for copies of checks and bank statements from 1983 to 1987 because they suspected forgery. Other than these general references to a possible forgery, Horney did nothing further. He did not give the Bank a list of the forged checks and did not ask the Bank to restore the funds or pursue repayment of the forged checks through normal banking channels.

Even after discovery of the forged checks, Horney never instructed the Bank to change the way it handled his accounts. In fact, Horney continued to conduct substantial business with the Bank until December 1991, when EZ Pickins filed for bankruptcy and the Bank obtained confession judgment on its note against Horney and Walker.

We find that the evidence clearly established that the Bank received insufficient notice from Horney regarding the alleged forgeries. Horney's claims against the Bank, asserted more than four years after discovery of the forgeries, are time barred by application of section 4—406.

We conclude that the trial court's ruling was not against the manifest weight of the evidence. Because we find that section 4—406 serves to completely bar Horney's claims, we decline to address the other issues raised.

The judgment of the circuit court of Iroquois County is affirmed.

Affirmed.

HOLDRIDGE and HOMER, JJ., concur.