C–WOOD LUMBER CO., INC.

v.

WAYNE COUNTY BANK.

Court of Appeals of Tennessee,
at Nashville.

Feb. 22, 2006 Session.

Jan. 24, 2007.

Permission to Appeal Denied by
Supreme Court June 18, 2007.

T. Jake Wolaver, Columbia, Tennessee, for the appellant, C–Wood Lumber Co., Inc.

George G. Gray, Waynesboro, Tennessee; Ben Boston and Ryan P. Durham, Lawrenceburg, Tennessee; and C. Anthony Edwards, Columbia, Tennessee, for the appellee, Wayne County Bank.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

This appeal involves a dispute between a lumber company and a bank in the aftermath of the company's discovery that its secretary/treasurer had embezzled approximately $500,000 by depositing checks payable to the company into her own and her children's personal accounts at the bank. The company filed a complaint in the Chancery Court for Wayne County seeking to recover the embezzled funds from the bank on the grounds of negligence and conversion. The bank responded that the company had executed a corporate resolution expressly authorizing the deposits. The trial court determined that the company's only viable claim was its negligence

claim. Following a bench trial, the court entered a judgment for the bank after concluding that the company's negligence exceeded that of the bank. The company has appealed. We have determined that company's only viable claim against the bank is its conversion claim under the Uniform Commercial Code. We have also determined that while the trial court correctly dismissed the company's claims involving the deposits in the secretary/treasurer's personal accounts because the company had expressly authorized them, the court erred by dismissing the company's claims based on the deposits into the accounts of the secretary/treasurer's children between July 1, 1996 and September 11, 1996.

## I.

C–Wood Lumber Company, Inc. (C–Wood) operates a sawmill and a kiln dry facility in Collinwood, Tennessee. The company was formed in 1983 by Danny and Brenda Sandusky and Pat Brewer. The Sanduskys later acquired Mr. Brewer's interest in the company and became equal owners of the corporation. Mr. Sandusky served as the corporation's president, and Ms. Sandusky served as the secretary/treasurer. Following the Sanduskys' divorce in 1988, Ms. Sandusky became the sole owner of the company and assumed the title of president. Ms. Sandusky remained sole shareholder throughout the events that led to this case.[1] Although the number of C–Wood employees fluctuated between twenty and thirty, the front office staff at all times relevant to this case consisted of Ms. Sandusky, Sue Lynville, and Diana McWilliams.

Ms. Sandusky treated C–Wood's corporate funds as her own and often instructed Ms. McWilliams to endorse and cash checks made payable to C–Wood and to give her the proceeds for her personal use. In addition to spending these funds on a mink coat and trips to Las Vegas and the Bahamas, Ms. Sandusky used the money while she was still married to take frequent trips to Nashville where she was carrying on a surreptitious extra-marital affair with one of C–Wood's accountants. Ms. McWilliams usually accompanied Ms. Sandusky to Nashville to lend an air of legitimacy to the trips.

Ms. Sandusky and Ms. McWilliams were close personal friends as well as business acquaintances. Ms. McWilliams had worked for C–Wood ever since it opened and had previously been employed by Ms. Sandusky's father. She had also been married to one of Ms. Sandusky's cousins for a time and, following her divorce, had dated one of Ms. Sandusky's other cousins. After the Sanduskys divorced, Ms. Sandusky named Ms. McWilliams secretary/treasurer of C–Wood.

On February 8, 1989, Ms. Sandusky and Ms. McWilliams executed a corporate resolution authorizing Ms. McWilliams to sign checks drawn on C–Wood's accounts at the Wayne County Bank.[2] Ten months later, on December 5, 1989, they executed a second corporate resolution substantially expanding Ms. McWilliams's authority. In addition to empowering Ms. McWilliams to sign corporate checks, the December 5, 1989 resolution authorized her "to endorse all notes, checks or drafts payable to the corporation and deposited to the credit of such account." This resolution also provided that

---

1. Ms. Sandusky's brother, Robert Farris, became C–Wood's chief executive officer in 1995 and received five percent of the company's stock in 1998.

2. This resolution did not authorize Ms. McWilliams to endorse or deposit checks payable to C–Wood.

The bank is hereby authorized to honor, receive, certify or pay all instruments signed in accordance with the foregoing resolution even though drawn or endorsed to the order of any officer signing the same, payable to cash or bearer or in payment of the individual obligation of such officer, or for deposit to his personal account and said bank shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolution or the application or disposition of such instrument or the proceeds thereof.

Ms. McWilliams began embezzling from C–Wood not long after becoming secretary/ treasurer. The company's lack of any internal controls made it relatively easy for Ms. McWilliams to carry out her scheme. She was generally the only employee who opened the mail, kept the books, and made the deposits. No one supervised her or checked her work. Accordingly, Ms. McWilliams simply endorsed checks received by C–Wood with "C–Wood Lumber Co., Inc. by Diana McWilliams, Sec. & Treas." and then deposited these checks either into her personal account or into her children's accounts at the Wayne County Bank. Between January 1989 and September 1996, Ms. McWilliams used the scheme to embezzle between $445,672.99 and $512,653.89 from C–Wood.

C–Wood had a long-standing banking relationship with Wayne County Bank. It maintained a number of accounts there, and Wayne County Bank provided factoring and other corporate loans to C–Wood. The tellers at Wayne County Bank were aware that Ms. McWilliams was endorsing checks payable to C–Wood and then either cashing these checks or depositing them into her personal accounts or into her children's accounts. However, they never questioned Ms. McWilliams directly about this practice. When the tellers called Ms. McWilliams's activities to the attention of bank officers, they were informed that Ms. McWilliams's actions were authorized by a C–Wood corporate resolution and that Larry Haggard, the bank's president, was aware of the practice.

Not surprisingly, C–Wood experienced serious cash flow problems during the years that Ms. McWilliams was embezzling company funds, even though the company's annual gross income averaged over $3,000,000. Ms. Sandusky stopped cashing her payroll checks and used her personal assets for corporate purposes. She spoke to other industry executives about cash flow, called in a software consultant to address the discrepancies between the accounting software and the company's bank statements, and performed feasibility studies to determine whether the company was operating as efficiently as possible. When one of the company's accountants suggested that someone might be stealing lumber, Ms. Sandusky hired a night watchman to guard the premises. Ms. Sandusky also reviewed the company's check ledger to determine whether an employee might be writing unauthorized corporate checks.

Despite Ms. Sandusky's efforts, C–Wood's financial woes continued. Sometime in 1993, the company filed for bankruptcy protection under Chapter 11. The company reorganized its operations and limited its activities to custom wood drying. Robert Farris took over as C–Wood's chief operating officer in 1995, but he too failed to discover what Ms. McWilliams was doing until 1996 when he was negotiating a loan with Wayne County Bank that would enable C–Wood to emerge from bankruptcy. In September 1996, a vice president of Wayne County Bank, Martin Haggard,

Jr.,[3] told Mr. Farris that one of the conditions of the loan would be that all checks payable to C–Wood must be deposited in corporate rather than in personal accounts.

Mr. Farris was surprised to learn that Ms. McWilliams was depositing checks payable to C–Wood into her personal account and into her children's accounts. He shared his conversation with Mr. Haggard with Ms. Sandusky, and they jointly decided to request the company's accountants to review the books. Ms. McWilliams's embezzlement was quickly discovered, and she was fired. Ms. McWilliams eventually pled guilty to charges stemming from her embezzlement, paid approximately $60,000 in restitution, and began serving her sentence on weekends.

C–Wood then turned to Wayne County Bank and demanded that it replace the funds that Ms. McWilliams had embezzled. The bank declined based on the corporate resolution executed on December 5, 1989 that specifically authorized the bank to accept checks payable to C–Wood for deposit into Ms. McWilliams's personal accounts.

On June 20, 1997, C–Wood filed suit in the Chancery Court for Wayne County seeking a declaratory judgment that the December 5, 1989 corporate resolution did not authorize Ms. McWilliams's actions and recovery of the funds that Ms. McWilliams had embezzled. C–Wood alleged that the bank knew that Ms. McWilliams's actions were in violation of her fiduciary duties as an officer of C–Wood and, therefore, that the bank took the checks subject to C–Wood's claims. C–Wood further alleged that the December 5, 1989 corporate resolution was insufficient to relieve the bank of its duties to C–Wood under Tenn. Code Ann. § 47–4–103(a).[4]

On November 17, 1997, C–Wood filed a motion for summary judgment regarding its claim that Tenn.Code Ann. § 47–4–103(a) undermined the validity of the December 5, 1989 corporate resolution. It did not file its required statement of undisputed facts until April 13, 1998. Five years later, on June 9, 2003, Wayne County Bank filed its own motion for summary judgment and statement of undisputed facts.

At this stage of the proceeding, Wayne County Bank asserted that it viewed C–Wood's complaint as a claim for conversion of a negotiable instrument under Tenn. Code Ann. § 47–3–420 (2001).[5] It conceded that it was required to make inquiries about Ms. McWilliams's conduct. However, it also insisted that it had made appropriate inquiries and that the December 5, 1989 resolution was the result of these inquiries. Specifically, the bank asserted (1) that it was aware that Ms. McWilliams was depositing checks made payable to C–Wood into personal accounts, (2) that it brought this activity to Ms. Sandusky's attention, (3) that Ms. Sandusky insisted that Ms. McWilliams be allowed to deposit C–Wood checks in her personal accounts, and (4) that it honored

**3.** Martin Haggard, Jr. was the brother of the bank's president, Larry Haggard.

**4.** Ms. McWilliams's embezzlement occurred from 1989 until 1996, and, therefore, two versions of Tenn.Code Ann. § 47–4–103 are implicated. The Uniform Commercial Code was amended in 1995, and the amendment became effective on July 1, 1996. *See* Act of May 22, 1995, ch. 397, Sec. 3, § 4–103, 1995 Tenn. Pub. Acts 617, 650.

**5.** Because Ms. McWilliams's embezzlement occurred from 1989 to 1996, the conversion claim implicated two versions of the Uniform Commercial Code's provision addressing claims for conversion of an instrument. This statute was amended in 1995, and the amendment became effective on July 1, 1996. *See* Act of May 22, 1995, ch. 397, Sec. 2, § 3–420, 1995 Tenn. Pub. Acts 617, 644 (codified at Tenn.Code Ann. § 47–3–420 (2001)).

Ms. Sandusky's request after she executed the December 5, 1989 resolution.

The trial court denied the motions for summary judgment on October 6, 2003. The court concluded that a factual dispute existed regarding the parties' communications about the "admittedly unusual" practice in which Ms. McWilliams had engaged. It also decided that if Ms. Sandusky and Wayne County Bank had not discussed Ms. McWilliams's conduct, the corporate resolutions executed in February and December 1989 would be insufficient to relieve the bank of liability for conversion under Tenn.Code Ann. § 47–3–420. The court also expressed its belief that the scope of Tenn.Code Ann. § 47–3–420 was limited to the conduct of persons who were not entitled to enforce an instrument. Therefore, the court held that the statute was inapplicable to this case because Ms. McWilliams was authorized to endorse checks made payable to C–Wood, and she was, therefore, entitled to enforce the checks. Accordingly, the trial court decided that the case should proceed only on C–Wood's negligence claim.

The trial court heard the case without a jury from July 7 through July 9, 2004. C–Wood's proof embodied claims of negligence, conversion, and fraudulent concealment on the part of Wayne County Bank. For its part, Wayne County Bank insisted that most of C–Wood's claims were time-barred. It also asserted that the December 5, 1989 corporate resolution shielded it from liability because Ms. Sandusky had explicitly acquiesced in Ms. McWilliams's conduct. The bank also insisted that even if it was at fault, C–Wood's lack of internal controls caused C–Wood to be comparatively more at fault.

On December 17, 2004, the trial court entered a lengthy opinion and judgment. The court determined that C–Wood failed to establish its conversion claims under Tenn.Code Ann. § 47–3–420 because Ms. McWilliams had authority to endorse the checks. The court decided that C–Wood's negligence claims were governed by the comparative fault principles in Tenn.Code Ann. § 47–3–406(b) (2001). Accordingly, the trial court denied C–Wood any recovery because its fault after 1991 exceeded any fault that could be attributed to the bank. C–Wood has appealed.

## II.

### THE STANDARD OF REVIEW

■ The standards this court uses to review the results of bench trials are well-settled. With regard to a trial court's findings of fact, we will review the record de novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d). We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton,* 950 S.W.2d 956, 959 (Tenn.1997); *B & G Constr., Inc. v. Polk,* 37 S.W.3d 462, 465 (Tenn.Ct.App. 2000). If, however, the trial court has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn.1997).

■ Reviewing findings of fact under Tenn. R.App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. There is a "reasonable probability" that a proposition is true when there is more evidence in its favor than there is against it. *Chapman v. McAdams,* 69 Tenn. (1 Lea) 500, 506 (1878); *see also* 2 McCORMICK ON EVIDENCE § 339, at 484 (Kenneth S. Broun ed., 6th ed.2006) (defining "proof by a preponder-

ance" as "proof which leads the [finder of fact] to find that the existence of the contested fact is more probable than its non-existence"). Thus, the prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *Parks Props. v. Maury County,* 70 S.W.3d 735, 741 (Tenn.Ct.App.2001); *Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn.Ct.App.1999).

■ Tenn. R.App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo,* 36 S.W.3d 837, 846 (Tenn.Ct.App.2000). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Parks Props. v. Maury County,* 70 S.W.3d at 742. Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn.Ct.App.2000).

■ The presumption of correctness in Tenn. R.App. P. 13(d) applies only to findings of fact, not conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson,* 37 S.W.3d 892, 894 (Tenn.2001); *Nutt v. Champion Int'l Corp.,* 980 S.W.2d 365, 367 (Tenn.1998); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.,* 60 S.W.3d 65, 71 (Tenn.Ct.App.2001); *Placencia v. Placencia,* 48 S.W.3d 732, 734 (Tenn.Ct.App. 2000).

## III.

### A SUMMARY OF STATUTES ADDRESSING THE RIGHTS AND RESPONSIBILITIES OF DEPOSITARY BANKS DEALING WITH FIDUCIARIES

The regular course of handling checks provides ample opportunity for corporate officers to embezzle funds from their corporations. Fraud is always involved when this sort of embezzlement occurs, but not necessarily forgery or alteration of the checks.[6] While embezzlement can assume many disguises,[7] one of the most common variations involves a corporate officer or other employee with the authority to endorse and deposit checks payable to the corporation who endorses a check on behalf of the corporation and then deposits the check into his or her personal account.[8]

When this sort of embezzlement occurs, the parties look to the law to provide principles for allocating the loss.[9] It is the law's challenge to provide loss-allocation principles that are realistic, financially reasonable, and essentially fair. For many decades, these principles have focused on whether the depositary bank[10] knew or

---

**6.** *See* 1 BARNEY CLARK & BARBARA CLARK, THE LAW OF BANK DEPOSITS, COLLECTION AND CREDIT CARDS ¶ 5.07[1], at 5–103 (2006) (THE LAW OF BANK DEPOSITS).

**7.** As Justice Cardozo noted, "[t]he phases of fraud are manifold." *Sleicher v. Sleicher,* 251 N.Y. 366, 167 N.E. 501, 503 (N.Y.1929).

**8.** THE LAW OF BANK DEPOSITS ¶ 5.07[3], at 5–109; Marion W. Benefield, Jr. & Peter A. Alces, *Bank Liability for Fiduciary Fraud,* 42 Ala.

L.Rev. 475, 492, 521 (1991) (*Bank Liability for Fiduciary Fraud* ).

**9.** These parties rarely include the embezzler who by the time the misappropriation is discovered has either disappeared or is judgment-proof. 2 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 18–1, at 207 (4th ed. 1995) (WHITE AND SUMMERS).

**10.** According to Tenn.Code Ann. § 47–4–105(2), a "depositary bank" is "the first bank

had notice of the officer's breach of fiduciary duty. Depositary banks that knew or had notice of the officer's breach of fiduciary duty are liable for the loss because they cannot qualify as holders in due course. However, over the past century, the legal standards for determining the nature and extent of a depositary bank's knowledge of a corporate officer's breach of his or her fiduciary obligations have changed.

English common law provided that, in the absence of bad faith, the holder of commercial paper would be shielded from antecedent claims and defenses as long as the holder did not have actual knowledge of these claims and defenses at the time of transfer. While the United States Supreme Court recognized and followed this rule, *Goodman v. Simonds*, 61 U.S. (20 How.) 343, 366–69, 15 L.Ed. 934 (1857), the Tennessee Supreme Court adopted an admittedly different and minority view. The court held that the holder of a negotiable instrument who took the instrument under circumstances that would put an ordinary person on inquiry was deemed to have notice of whatever the inquiry would have disclosed. *Merritt v. Duncan*, 54 Tenn. (7 Heisk.) 156, 164 (1872); *Hunt v. Sandford*, 14 Tenn. (6 Yer.) 387, 392 (1834).

The Uniform Negotiable Instruments Law (UNIL), which was drafted in 1896 and eventually enacted in every state, abolished the doctrine of constructive notice favored by the Tennessee Supreme Court. Thus, the precedential value of *Hunt v. Sandford* and *Merritt v. Duncan* was undermined substantially when the Tennessee General Assembly enacted the UNIL in 1899.[11] *Soloff v. Dollahite*, 779 S.W.2d 57, 58 (Tenn.Ct.App.1989) (holding that the doctrine of constructive notice as applied to negotiable instruments was abolished in 1899 by the UNIL).

Section 56 of the UNIL [12] required actual knowledge or bad faith before the taker of any instrument was put on notice of any infirmity or defect in the instrument.[13] However, many courts ignored Section 56 when the face of the instrument reflected that it was either drawn, made, or endorsed by a fiduciary.[14] Tennessee's appellate courts were among the courts that resorted to a cramped interpretation of Section 56. *See e.g., Ford v. H.C. Brown & Co.*, 114 Tenn. 467, 478–80, 88 S.W. 1036, 1038–39 (1904) (holding that the designation of "trustee" on an endorsement required the purchaser of two certificates of deposit to inquire into the right of the trustee to dispose of them); *Stansbury v. Bank of Amory*, 13 Tenn.App. 673, 678–79 (1931) (holding that the bank had a duty to inquire into a guardian's authority to assign a bond).

In 1922,[15] the National Conference of Commissioners on Uniform State Laws (NCCUSL) and the American Bar Association approved the Uniform Fiduciaries Act (UFA) for the express purpose of over-

to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter."

**11.** Act of Apr. 3, 1899, ch. 94, 1899 Tenn. Pub. Acts 139 (codified as amended at Tenn. Code Ann. §§ 47–101 through –169 (1955)).

**12.** Tenn.Code Ann. § 47–156.

**13.** Tenn.Code Ann. § 47–156 provided:
To constitute notice of an infirmity in the instrument or defect in the title of the person

negotiating the same, the person to whom it is negotiated must have actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.

**14.** *See* Uniform Fiduciaries Act § 6 cmt., 7A U.L.A. 389 (2002).

**15.** Uniform Fiduciaries Act, Historical Note, 7A U.L.A. 364 (2002).

turning the cases limiting the application of Section 56 of the UNIL. Uniform Fiduciaries Act § 6 cmt., 7A U.L.A. 389; *County of Macon v. Edgcomb*, 274 Ill.App.3d 432, 211 Ill.Dec. 136, 654 N.E.2d 598, 600 (Ill.App.Ct.1995). Twenty-four states, as well as the District of Columbia and the Virgin Islands, adopted the UFA.[16] Tennessee adopted the UFA in 1953.[17]

The UFA specifically addressed circumstances in which fiduciaries deposit their principal's funds into their personal bank accounts. Section 109 (Tenn.Code Ann. § 35–2–109) provides, in part, that

[i]f a fiduciary makes a deposit in a bank ... to the fiduciary's personal credit ... of checks payable to the principal and endorsed by the fiduciary, if the fiduciary is empowered to endorse such checks, the bank ... receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of the obligation as fiduciary. The bank ... is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal unless the bank ... receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of the obligation as fiduciary in making such deposit ... or with knowledge of such facts that its action in receiving the deposit ... amounts to bad faith.

The UFA's definition of "fiduciary" includes corporate officers. Tenn.Code Ann. § 35–2–102(2).

█ The UFA was designed to facilitate banking transactions by relieving depositary banks of the responsibility of assuring that an authorized fiduciary used entrusted funds for proper purposes. *In*

*re Broadview Lumber Co.*, 118 F.3d 1246, 1251 (8th Cir.1997); *Springfield Twp. v. Mellon PSFS Bank*, 586 Pa. 1, 889 A.2d 1184, 1187 (Pa.2005). It is based on the assumption that a fiduciary will properly apply funds entrusted to him or her, and it places the burden on the principal to employ honest fiduciaries. *Bank Liability for Fiduciary Fraud*, 42 Ala. L.Rev. at 492, 520. It also specifically rejects the idea that negligence on the part of a third person dealing with a fiduciary is sufficient to shift the risk of fiduciary misconduct from the principal to the third party. *New Amsterdam Cas. Co. v. Nat'l Newark & Essex Banking Co.*, 117 N.J. Eq. 264, 175 A. 609, 613 (N.J.Ch.1934), *aff'd*, 119 N.J. Eq. 540, 182 A. 824 (N.J.1936); *Edwards v. Northwestern Bank*, 39 N.C.App. 261, 250 S.E.2d 651, 656 (N.C.Ct.App.1979).

Section 9 of the UFA (Tenn.Code Ann. § 35–2–109) protects the bank even when the fiduciary deposits checks payable to the principal in his or her personal account. A depositary bank may permit withdrawal of the proceeds from these checks by personal check of the fiduciary without a duty of inquiry and, furthermore, without becoming liable for any breach of the fiduciary's obligation, unless the bank has actual knowledge of the breach of fiduciary duty or is acting in bad faith. *Johnson v. Citizens Nat'l Bank*, 30 Ill.App.3d 1066, 334 N.E.2d 295, 300, (Ill.App.Ct.1975); *Bank Liability for Fiduciary Fraud*, 42 Ala. L.Rev. at 492, 523.

In 1957, the Permanent Editorial Board, acting under the auspices of the NCCUSL and the American Law Institute (ALI), published a revised version of the Uniform Commercial Code (UCC). During the ensuing ten years, this version of the UCC

**16.** Uniform Fiduciaries Act, Table of Jurisdictions Where Act Has Been Adopted, 7A U.L.A. 111 (Supp.2006).

**17.** Act of Mar. 3, 1953, 1953 Tenn. Pub. Acts 280 (codified at Tenn.Code Ann. §§ 35–2–101 through –112 (2001)).

was enacted in all but three states.[18] The Tennessee General Assembly enacted a variant of the 1957 version of the UCC in 1963,[19] and it became effective in Tennessee at midnight on June 30, 1964.

The provisions of the UFA and the original version of the UCC as adopted in Tennessee are consistent with regard to the rights and responsibilities of banks accepting deposits from fiduciaries of checks payable to the fiduciary's principal.[20] Section 9 of the UFA (Tenn.Code Ann. § 35–2–109) addressed the bank's rights and responsibilities head-on. The original version of the UCC addressed them indirectly. Section 3–304(2) (Tenn. Code Ann. § 47–3–304(2)) provided in general terms that the purchaser "has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty." In addition, Section 3–304(4)(e) (Tenn.Code Ann. § 47–3–304(4)(e)) provided that knowledge that the person negotiating an instrument is or was a fiduciary did not "of itself" give the purchaser notice of a defense or claim.

In a case decided over thirty years ago dealing with a factual circumstance similar to the one before us, the Tennessee Supreme Court held that the UFA and the UCC should be construed together. *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 881–82 (Tenn.1973). The case involved the efforts of the trustee of a bankrupt corporation to recover from a depositary bank that had allowed the president of the bankrupt corporation to endorse checks payable to the corporation and to deposit these checks into his personal account. The court held that the bank could be held liable for depositing these checks under both the UFA and the UCC only if the bank had acted dishonestly or with actual knowledge of the claim under Tenn.Code Ann. § 47–3–304(2). The court absolved the bank of liability because "the bank simply did not have actual knowledge or notice from the face of the instrument that a fiduciary was negotiating the instruments for his own benefit and in violation of his duty." *McConnico v. Third Nat'l Bank*, 499 S.W.2d at 886.

The original version of Articles 3 and 4 of the UCC pertaining to checks and other negotiable instruments contemplated a paper-based system with a largely manual collection process. Over the years, however, the volume of checks increased dramatically, the collection process became highly automated, and the federal government began to regulate some areas of bank collections along with the state-based UCC regulatory scheme.[21] Accordingly, in 1990, the NCCUSL and the ALI approved revisions to Articles 3 and 4 to address these changes.[22]

---

**18.** Uniform Commercial Code, General Comment, 1 U.L.A. xvii, and Report No. 3 of the Permanent Editorial Bd., 1 U.L.A. xxxv (2004).

**19.** Act of Mar. 5, 1963, ch. 81, 1963 Tenn. Pub. Acts 243 (originally codified at Tenn. Code Ann. §§ 47–1–101 through 47–9–507 (1964)).

**20.** *See* 1 THE LAW OF BANK DEPOSITS ¶ 5.07[1], at 5–103; *In re Broadview Lumber Co.*, 118 F.3d at 1252; *Coeur d'Alene Mining Co. v. First Nat'l Bank of N. Idaho*, 118 Idaho 812, 800 P.2d 1026, 1032–33 (Idaho 1990).

**21.** A. Brooke Overby, *Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4*, 57 Ala. L.Rev. 351, 354 (2005) (*Check Fraud in the Courts* ).

**22.** Revised Article 3—Negotiable Instruments, Prefatory Note, 2 U.L.A. 8–13 (2004); Fred H. Miller, *The Benefits of New UCC Articles 3 and 4*, 24 UCC L.J., 99, 102–04 (1991).

The Tennessee General Assembly did not adopt the 1990 revisions to the UCC until 1995,[23] and the changes did not take effect in Tennessee until July 1, 1996. Notwithstanding the NCCUSL's and ALI's emphasis on the importance of uniformity, the General Assembly adopted several significant variations from the revised text of Articles 3 and 4. Many commentators had concluded that the 1990 revisions to Articles 3 and 4 shifted the burden of the losses caused by check fraud to bank customers and consumers,[24] and at least one commentator viewed Tennessee's amendments to these revisions as tipping the scales even further in the banks' favor.[25]

Despite the pro-bank leanings of the 1990 revisions to Articles 3 and 4 and the further modifications by the Tennessee General Assembly in 1995, the current version of the UCC substantially changes the rules applicable to depositary banks that take checks from fiduciaries. Section 3–307 (Tenn.Code Ann. § 47–3–307) is an elaborate statement of the "red flag" circumstances under which the taker from a fiduciary [26] will be deemed to be "on notice" and, therefore, subject to claims of the principal that the fiduciary has misappropriated funds.[27] This provision is a significant departure from the UFA, and it specifically rejects the "actual notice" rule in Section 9 of the UFA (Tenn.Code Ann. § 35–2–109).[28] It substantially affects a bank's ability to achieve holder-in-due-course status and the resulting protection from claims by a fiduciary's principals.[29]

■ Under Tenn.Code Ann. § 47–3–307(b)(2)(iii), a depositary bank is on notice of a breach of fiduciary duty if the depositary bank allows the fiduciary to deposit a check payable to a "represented person" [30] in any account other than an account of the represented person or the "fiduciary as such." [31] Thus, Tenn.Code Ann. § 47–3–307 treats a deposit by a fiduciary in a personal account as, in effect, a suspicious circumstance that imposes on the depositary bank the risk that the deposit is part

---

**23.** Act of May 22, 1995, ch. 397, 1995 Tenn. Pub. Acts 617.

**24.** *Check Fraud in the Courts*, 57 Ala. L.Rev. at 353.

**25.** Virginia Wilson, *The Law of Negotiable Instruments, Bank Deposits, and Collections in Tennessee: A Survey of Changes in the 1990 Revisions to UCC Articles 3 and 4*, 28 U. Mem. L.Rev. 117, 142 (1997) (Wilson).

**26.** The revised UCC defines a "fiduciary" as "an agent, trustee, partner, corporate officer or director, or other representative owing a fiduciary duty with respect to the instrument." Tenn.Code Ann. § 47–3–307(a)(1).

**27.** Tenn.Code Ann. § 47–3–307 cmt. 2; 6B LARY LAWRENCE, ANDERSON ON THE COMMERCIAL CODE § 3–307:4R, at 368 (3d ed. rev.2003) (ANDERSON ON THE COMMERCIAL CODE); 1 THE LAW OF BANK DEPOSITS ¶ 5.07[1], at 5–103; 6 WILLIAM B. HAWKLAND ET AL., UNIFORM COMMERCIAL CODE SERIES § 3–307:5[Rev] (Frederick H. Miller ed. 1999) (HAWKLAND); *Bank Liability for Fiduciary Fraud*, 42 Ala. L.Rev. at 517.

**28.** Tenn.Code Ann. § 47–3–307 cmt. 3; *County of Macon v. Edgcomb*, 211 Ill.Dec. 136, 654 N.E.2d at 602; 1 THE LAW OF BANK DEPOSITS ¶ 5.07[3], at 5–111; *Bank Liability for Fiduciary Fraud*, 42 Ala. L.Rev. at 519–20.

**29.** WHITE & SUMMERS § 18–4, at 216 (stating that banks with notice under Section 3–307(b) are not holders in due course and must have some liability to the check's true owner).

**30.** The revised UCC defines a "represented person" as "the principal, beneficiary, partnership, corporation, or other person to whom the duty stated in paragraph (1) is owed." Tenn.Code Ann. § 47–3–307(a)(2).

**31.** ANDERSON ON THE COMMERCIAL CODE § 3–307:9R, at 370–71; 2 THE LAW OF BANK DEPOSITS ¶ 12.05[8][d], at 12–150; 2 WHITE & SUMMERS § 19–5, at 266; *Bank Liability for Fiduciary Fraud*, 42 Ala. L.Rev. at 520.

of an embezzlement scheme.[32]

■ Tenn.Code Ann. § 47–3–307 imposes liability on a depositary bank that accepts a check payable to the principal and endorsed by a fiduciary for deposit into the fiduciary's personal account without regard to comparative fault principles.[33] In Tennessee, comparative fault principles apply only with regard to forged signatures or altered instruments. However, an endorsement by a fiduciary with the authority to endorse and deposit checks payable to the principal is not a forgery under the UCC.[34] Therefore, the liability of a depositary bank when a fiduciary with authority endorses and deposits a check payable to his or her principal in the fiduciary's personal account is governed by Tenn.Code Ann. § 47–3–307 rather than by Tenn.Code Ann. §§ 47–3–405 or 47–3–406.[35]

Section 3–307 (Tenn. Code Ann. § 47–3–307) invites payees of checks embezzled by the payee's fiduciary to sue the depositary bank for conversion under Tenn.Code Ann. § 47–3–420.[36] While this rigid rule is not without its critics,[37] there is substantial authority supporting it. One authority has pointed out that "in the employee context, it is so unusual for a check payable or endorsed to an employer to be deposited into the personal account of an employee-fiduciary, that in all such cases the depositary bank should assume the risk that the employee making the deposit is breaching her [or his] fiduciary duty." [38]

---

**32.** The rationale behind Tenn.Code Ann. § 47–3–307(b)(2)(iii) is that "it is not normal for an instrument payable to the represented person or the fiduciary, as such, to be used for the personal benefit of the fiduciary. It is likely that such use reflects an unlawful use of the proceeds of the instrument." Tenn.Code Ann. § 47–3–307 cmt. 3; *see also* HAWKLAND § 3–307:5[Rev]; *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. at 520.

**33.** The 1990 revisions to the UCC incorporated comparative fault principles in Sections 3–404, 3–405, and 3–406 involving imposters, fictitious payees, and forged endorsements. While the Tennessee General Assembly did not enact the comparative fault provisions in Sections 3–404(d) or 3–405(b), it did enact the comparative fault provision applicable to forged signatures or endorsements in Section 3–406(b). *See* Tenn.Code Ann. § 47–3–406(b); Wilson, 28 U. Mem. L.Rev. at 146, 151.

**34.** *Mid–Continent Specialists, Inc. v. Capital Homes, L.C.,* 279 Kan. 178, 106 P.3d 483, 490 (Kan.2005); 2 WHITE & SUMMERS § 18–4, at 216–17; *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. at 481.

**35.** The comments to the 1990 revisions to the UCC make this point as follows:

Employee's duties include stamping Employer's unrestricted blank endorsement on checks received by Employer and depositing them in Employer's bank account. After stamping Employer's unrestricted blank endorsement on a check, Employee steals the check and deposits it in Employee's personal bank account. Section 3–405 doesn't apply because there is no forged endorsement. Employee is authorized by Employer to endorse Employer's checks. The fraud by Employee is not the endorsement but rather the theft of the endorsed check. Whether Employer has a cause of action against the bank in which the check was deposited is determined by whether the bank had notice of the breach of fiduciary duty by Employee. The issue is determined under Section 3–307.

Tenn.Code Ann. § 47–3–405 cmt. 3 Case # 4. *See also* ANDERSON ON THE COMMERCIAL CODE § 3–307:8R, at 370; WHITE & SUMMERS § 19–5, at 267; *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. at 535–36 (noting that if a corporate employee is also a fiduciary, then Section 3–307 rather than Section 3–405 applies).

**36.** 2 WHITE & SUMMERS §§ 18–4, at 216 & 19–5, at 273.

**37.** 1 THE LAW OF BANK DEPOSITS ¶ 5.07[3], at 5–112; 2 WHITE & SUMMERS § 19–5, at 268; *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. at 478, 547–48.

**38.** *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. at 548.

This authority concludes that "it may be that the relative certainty that exists under revised section 3–307 is preferable to the *greater flexibility, and its inherent uncertainty*, under revised section 3–405." [39]

When Tenn.Code Ann. § 47–3–307 took effect in 1996, it replaced any provisions in the prior versions of the UCC involving the rights and obligations of depositary banks accepting deposits by fiduciaries. It did not, however, expressly repeal Tenn.Code Ann. § 35–2–109. While repeals by implication are not favored, they occur when the substance of a later statute cannot be construed harmoniously with that of an earlier statute. *In re Akins,* 87 S.W.3d 488, 493 (Tenn.2002); *Cronin v. Howe,* 906 S.W.2d 910, 912 (Tenn.1995). Because Tenn.Code Ann. § 47–3–307 and Tenn.Code Ann. § 35–2–109 cannot be construed harmoniously, Tenn.Code Ann. § 47–3–307 prevails and governs all transactions occurring after its effective date.

## IV.

### THE CLAIMS AGAINST THE BANK AVAILABLE TO C–WOOD

At the outset, we must confess to some uncertainty regarding the precise claims that C–Wood initially asserted against the bank, the claims that were actually tried, and the claims that the trial court actually disposed of. These are matters of some importance because they influence the selection of the substantive legal principles that should be used to resolve this dispute. The record reflects that the trial court's decision may be based, at least in part, on common-law negligence principles in addition to the UCC. We have determined, however, that the UCC effectively displaced any common-law claims that C–Wood may have been asserting.

### A.

Ascertaining the litigants' claims and defenses ought to be a straight-forward exercise. When the parties heed the requirements of the Tennessee Rules of Civil Procedure, the averments in their pleadings are "simple, concise and direct." [40] Thus, litigants asserting claims must provide a "short and plain statement" of each claim showing that they are entitled to relief.[41] By the same token, litigants defending against a claim must state their defenses in "short and plain terms." [42]

Regrettably, C–Wood's complaint falls far short of even the most rudimentary pleading requirements. It is difficult to ascertain C–Wood's theories of recovery from its complaint. However, during the seven years that elapsed between the filing of its complaint and the trial, C–Wood gradually defined more precisely what its theories of recovery were, and, not surprisingly, these theories changed over time. In order to address the trial court's disposition of this case, we must retrace the evolution of C–Wood's claims.

C–Wood's complaint states in general terms that it seeks a "declaratory judgment and other relief." [43] With regard to its declaratory judgment claim, C–Wood requested the trial court to declare either that the December 5, 1989 resolution was not broad enough to insulate the bank from liability or that the resolution was

**39.** *Bank Liability for Fiduciary Fraud,* 42 Ala. L.Rev. at 549.

**40.** Tenn. R. Civ. P. 8.05(1).

**41.** Tenn. R. Civ. P. 8.01(1).

**42.** Tenn. R. Civ. P. 8.02.

**43.** The "other relief" C–Wood requested was a "judgment ... for the full amount of ... [its] losses."

"precluded by statutes[44] and public policy." C–Wood's complaint also asserted that the bank knew or should have known that Ms. McWilliams's deposits into her personal accounts were "unauthorized ... and represented ... conversions ... of ... [C–Wood's] funds" and that these deposits "caused the ... [bank] to be on notice of Diana L. McWilliams' breach of fiduciary duty." Accordingly, the complaint asserted that the bank's failure to refuse Ms. McWilliams's deposits and to alert C–Wood to Ms. McWilliams's activities rendered the bank liable for C–Wood's losses.

C–Wood later filed a motion for partial summary judgment on its claim that the December 5, 1989 resolution did not shield the bank from liability. In its brief supporting the motion, filed almost one year after its complaint had been filed, C–Wood stated that its two theories of recovery against the bank were (1) negligence and (2) that its rights were superior to the bank because the bank had failed to require Ms. McWilliams to endorse the checks personally before she deposited them into her personal accounts.

Five years elapsed, and in June 2003, the bank finally responded to C–Wood's summary judgment motion. It characterized C–Wood's "substantive claim" as a claim for conversion, and it denied that it had acted negligently by permitting Ms. McWilliams to deposit the checks made payable to C–Wood. The bank asserted that it had brought these transactions to Ms. Sandusky's attention and that Ms. Sandusky had executed the December 5, 1989 resolution to memorialize her approval of the practice.

In October 2003, C–Wood filed a supplemental brief supporting its summary judgment motion that had been pending for almost six years. C–Wood recast its claims again. Without mentioning its negligence claim, C–Wood asserted that the December 5, 1989 resolution did not shield the bank from liability because it was not broad enough to cover Ms. McWilliams's transactions and because Tenn.Code Ann. § 47–1–102(a) prevented the bank from disclaiming liability. It also asserted that it was seeking to recover from the bank for conversion under Tenn.Code Ann. § 47–3–419 for the pre-July 1996 transactions and under Tenn.Code Ann. § 47–3–420 for the post-July 1996 transactions.[45]

The trial court denied C–Wood's summary judgment motion on October 6, 2003. In its order and in a conference telephone call with counsel, the court explained that it denied the motion because the record reflected genuine, material factual disputes regarding the communications between the bank and Ms. Sandusky regarding Ms. McWilliams's transactions. The court also acknowledged that C–Wood had asserted both negligence and conversion claims and advised counsel that it "believed" that a conversion claim was "inapplicable" because the checks endorsed by Ms. McWilliams were properly endorsed.[46]

---

**44.** The complaint asserted that the pre-July 1996 and post July 1996 versions of Tenn. Code Ann. § 47–4–103(a) and Tenn.Code Ann. § 47–1–102(3) "should be construed to limit the bank's ability to avoid liability for its own negligence."

**45.** Tennessee's version of the UCC was revised effective July 1, 1996. Prior to July 1, 1996, Tenn.Code Ann. § 47–3–419 governed conversion claims. Following July 1, 1996,

conversion claims were governed by Tenn. Code Ann. § 47–3–420.

**46.** The only claim before the court in October 2003 was the declaratory judgment claim regarding the efficacy of the December 1989 resolution. C–Wood's summary judgment motion did not involve its negligence or conversion claims. Accordingly, the trial court's beliefs regarding C–Wood's conversion claim

Accordingly, the trial court stated that it "understood" that the parties "would re-evaluate the case and proceed with preparation for settlement, trial or other disposition."

The status of C–Wood's claims was still fluid as the trial approached in July 2004. In its pretrial brief, C–Wood asserted that the bank had acted negligently by allowing Ms. McWilliams to deposit checks made payable to. C–Wood into her personal account. It also asserted that the bank could not claim to be a holder in due course because it had notice that Ms. McWilliams was breaching her fiduciary duty as an officer of C–Wood.[47]

When the trial commenced on July 7, 2004, the parties and the trial court were still attempting to pin down what C–Wood's claims were. C–Wood's lawyer announced to the trial court that

> we believe that this case has moved on into the negligence. We are still alleging that conversion took place, but we are also fragmentous [sic], Your Honor, and understand that Your Honor is looking in the negligence direction.

C–Wood's continued reliance on the conversion theory of recovery prompted the bank's counsel to seek a clarification of the trial court's October 6, 2003 summary judgment order because he understood that the trial court had already disposed of C–Wood's conversion claim. After considerable discussion, the court decided that it had not disposed of C–Wood's conversion claim and that "we might as well hear the proof of the parties on ... [the conversion] issue. There will not be any summary judgment on that issue granted at this time in favor of the bank."

**B.**

■ The drafters of the UCC set out to preserve and, where necessary, clarify and conform the law merchant with modern commercial practice. Tenn.Code Ann. §§ 47–1–102(2)(a), –103; 22 SAMUEL WILLISTON, TREATISE ON THE LAW OF CONTRACTS § 60:1, at 488–89 (Richard A. Lord ed., 4th ed.2002). The Code does not purport to codify the entire body of law affecting the rights and obligations of parties to commercial transactions. *New Jersey Bank, N.A. v. Bradford Sec. Operations, Inc.*, 690 F.2d 339, 345 (3d Cir.1982); *Peoples Bank & Trust Co. of Van Buren v. Wallace*, 290 Ark. 589, 721 S.W.2d 659, 662 (Ark.1986); *Pioneer State Bank v. Johnsrud*, 284 N.W.2d 292, 297 (N.D.1979). Thus, unless "displaced" by particular provisions of the UCC, other principles of law and equity that are consistent with the UCC remain valid. Tenn.Code Ann. § 47–1–103; *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 548–49 (Tenn.1996).

Even though the UCC does not supplant all the law applicable to commercial transactions, it is still the primary source of the commercial law rules for the areas it governs because it represents the considered choices of its drafters and of the Tennessee General Assembly about the appropriate policies to be furthered in the transactions it covers. *See* UCC § 1–103 cmt. 2 (revised 2001), 1 U.L.A. 11 (2004). The purposes and policies reflected in the UCC include (a) simplifying, clarifying, and modernizing the law governing commercial transactions, (b) permitting the continued expansion of commercial practices through custom, usage, and agreement of the par-

did not amount to a formal disposition of the claim.

**47.** For the first time in the seven years that this case had been pending, C–Wood cited

Tenn.Code Ann. § 47–3–307(b)(2)(ii), (iii) as a basis for its assertion that the bank knew that Ms. McWilliams was breaching her fiduciary duty.

ties, and (c) making uniform the law among the various jurisdictions. Tenn. Code Ann. § 47–1–102(2). Thus, while generally applicable principles of law and equity can be used to supplement the UCC, they may not be used to supplant the UCC's provisions or the purposes or policies these provisions reflect. UCC § 1–103 cmt. 2 (revised 2001), 1 U.L.A. 11 (2004); 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 1–C, at 7 (5th ed.2006) (analyzing the comments to the 2001 revisions to Article 1).

Courts determining whether common-law or other non-UCC claims and remedies have been displaced by the UCC have emphasized the policies favoring certainty and uniformity. Thus, the prevailing view now is that when the UCC provides a comprehensive remedy for the parties to a transaction, common-law and other non-Code claims and remedies should be barred. *New Jersey Bank, N.A. v. Bradford Sec. Operations, Inc.,* 690 F.2d at 346; *Sebastian v. D & S Express, Inc.,* 61 F.Supp.2d 386, 391 (D.N.J.1999); *Am. Liberty Ins. Co. v. AmSouth Bank,* 825 So.2d 786, 794–95 (Ala.2002); *First Ga. Bank v. Webster,* 168 Ga.App. 307, 308 S.E.2d 579, 581 (Ga.Ct.App.1983).

Articles 3 and 4 of the UCC embody a delicately balanced statutory scheme governing the endorsement, negotiation, collection, and payment of checks. They provide discrete loss-allocation rules uniquely applicable to banks. *Southwest Bank v. Info. Support Concepts, Inc.,* 85 S.W.3d 462, 467 (Tex.App.2002). While this scheme is not comprehensive, it is nearly so. Therefore, courts dealing with "hard cases" should be hesitant to recognize common-law or non-U.C.C. claims or to employ common-law or non-UCC remedies in the mistaken belief that they are dealing with one of the rare transactions not covered by the UCC. *Brown v. Cash Mgmt. Trust of Am.,* 963 F.Supp. 504, 506 (D.Md. 1997); 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 16–6, at 805–06 (3d ed.1988).

■ The weight of the case law comes down against permitting common-law actions to displace the UCC's provisions regarding transactions governed by Articles 3 and 4. *Check Fraud in the Courts,* 57 Ala. L.Rev. at 391–92. Accordingly, a large number of courts have refused to recognize common-law or non-UCC claims in general,[48] and specifically common-law or non-UCC negligence claims [49] or conversion claims,[50] arising from transactions governed by Articles 3 or 4. The transactions at issue in this case fall squarely within the scope of Articles 3 and 4. Therefore, C–Wood's claims against the bank

---

48. *See, e.g., Chouteau Auto Mart, Inc. v. First Bank of Mo.,* 55 S.W.3d 358, 362 (Mo.2001) (holding that common-law theories are inapplicable because the U.C.C. and the Uniform Fiduciaries Act specifically addressed the liability of banks dealing with fiduciaries); *See also Check Fraud in the Courts,* 57 Ala. L.Rev. at 391–92.

49. *Gress v. PNC Bank, N.A.,* 100 F.Supp.2d 289, 292 (E.D.Pa.2000); *San Tan Irrigation Dist. v. Wells Fargo Bank,* 197 Ariz. 193, 3 P.3d 1113, 1115 (Ariz.Ct.App.2000); *Flavor-Inn, Inc. v. NCNB Nat'l Bank of South Carolina,* 309 S.C. 508, 424 S.E.2d 534, 536 (Ct.App.1992); 1A LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE §§ 1–103:185R, at 618–19, 1–103:308R, at 668 (3d ed.2004); *Check Fraud in the Courts,* 57 Ala. L.Rev. at 391–92.

50. *Stefano v. First Union Nat'l Bank,* 981 F.Supp. 417, 420 (E.D.Va.1997); *Am. Liberty Ins. Co. v. AmSouth Bank,* 825 So.2d at 795–96; *Gallagher v. Santa Fe Fed. Employees Fed. Credit Union,* 132 N.M. 552, 52 P.3d 412, 416 (N.M.Ct.App.2002); *Halla v. Norwest Bank Minnesota, N.A.,* 601 N.W.2d 449, 451 (Minn. Ct.App.1999); *Check Fraud in the Courts,* 57 Ala. L.Rev. at 391–92.

and the scope of the remedies available to C–Wood are governed solely by the UCC.

## V.

### C–Wood's UCC Claims Against the Bank

Having determined that C–Wood's claims against the bank are governed exclusively by the UCC, we must now determine whether C–Wood has asserted UCC claims against the bank and, if so, which of these claims are viable. This task is complicated by the fact that Ms. McWilliams's deposits occurred both before and after the effective date of the 1995 changes in Tennessee's version of Articles 3 and 4 of the UCC. We have determined that C–Wood's only viable claims against the bank are for conversion.

■■■ The rights and obligations of parties engaged in a commercial transaction are customarily governed by the law in effect when the transactions occurs. *Winter v. Smith,* 914 S.W.2d 527, 537 (Tenn.Ct. App.1995); *see also Chouteau Auto Mart, Inc. v. First Bank of Mo.,* 55 S.W.3d at 360–61. There are two reasons for this principle. The first reason is that contracts incorporate all the legal principles affecting their enforcement that are in existence when they are made. *Kee v. Shelter Ins. Co.,* 852 S.W.2d 226, 228 (Tenn. 1993). The second reason is that contracts create substantive rights that cannot be modified or impaired retroactively. *See Kuykendall v. Wheeler,* 890 S.W.2d 785,

787 (Tenn.1994); *Ingram v. Earthman,* 993 S.W.2d 611, 624 (Tenn.Ct.App.1998).

■■■ Accordingly, statutes are generally not given retroactive effect unless the legislature has clearly expressed an intention that the new statute is to be applied retroactively. *In re D.A.H.,* 142 S.W.3d 267, 273 (Tenn.2004); *Nutt v. Champion Int'l Corp.,* 980 S.W.2d at 368. This is especially so in the case of amendments to existing statutes that change substantive, as opposed to procedural, matters. When called upon to determine whether statutory amendments should be applied retroactively, the courts may look to the legislative history of the statute in general and in particular to the legislative intent, if any, regarding retroactivity. *See Battle Creek State Bank v. Haake,* 255 Neb. 666, 587 N.W.2d 83, 93 (Neb.1998).

■■■ The Tennessee General Assembly did not express any desire for the 1996 amendments to Articles 3 and 4 to be applied to transactions occurring before July 1, 1996. Thus, because these amendments affect substantive rights, they should not be applied retroactively.[51] *See Vending Chattanooga, Inc. v. Am. Nat'l Bank & Trust Co.,* 730 S.W.2d 624, 627 (Tenn.1987) (approving an earlier decision not to apply the original UCC to transactions occurring before it took effect). Other courts have determined that the substantive provisions of Articles 3 and 4 should not be applied retroactively.[52] Accordingly, for the purposes of this case, the

---

51. Revised Section 3–307 of the UCC is more than a clarification of existing law. It is a substantive change in the law. Accordingly, it cannot have retroactive effect. 1 The Law of Bank Deposits ¶ 5.07[3], at 5–112.

52. *Kenerson v. Morgan Guar. Trust Co.,* 889 F.Supp. 523, 527 n. 8 (D.N.H.1995); *Choo Choo Tire Serv., Inc. v. Union Planters Nat'l Bank,* 231 Ga.App. 346, 498 S.E.2d 799, 802 (Ga.Ct.App.1998); *Ford Motor Credit v. Moore,* 663 A.2d 30, 32 (Me.1995); *Geldert v.*

*Am. Nat'l Bank,* 506 N.W.2d 22, 27 (Minn.Ct. App.1993); *Carelli v. Hall,* 279 Mont. 202, 926 P.2d 756, 761–62 (Mont.1996); *Interchange State Bank v. Veglia,* 286 N.J.Super. 164, 668 A.2d 465, 476 (N.J.Super.Ct.App.Div.1995); *Public Citizen, Inc. v. First Nat'l Bank in Fairmont,* 198 W.Va. 329, 480 S.E.2d 538, 544 (W.Va.1996); *Schmitz v. Firstar Bank Milwaukee,* 260 Wis.2d 24, 658 N.W.2d 442, 450 n. 15 (Wis.2003).

rights and obligations of the parties with regard to Ms. McWilliams's transactions occurring from January 1989 through June 30, 1996 are governed by the provisions of the UCC as they existed prior to the effective date of the 1995 amendments. On the other hand, the rights and obligations of the parties with regard to Ms. McWilliams's transactions occurring from July 1, 1996 through September 1996 are governed by the amended versions of the UCC.

## VI.

### THE APPLICABLE STATUTE OF LIMITATIONS

██ The trial court never definitively determined which statute or statutes of limitations apply to C–Wood's claims in this case. Its December 17, 2004 opinion and judgment mentions the three statutes of limitations in Tenn.Code Ann. § 47–4–111 (2001) and Tenn.Code Ann. § 28–3–105 (2000) and the one-year statute of limitations in Tenn.Code Ann. § 47–4–406 (2001), and then concludes:

C–Woods's claims against the bank for the McWilliams thefts occurring more than one year, and certainly more than three years, before the filing of the complaint are barred by applicable statutes of limitation.

None of the statutes of limitations cited by the trial court apply to C–Wood's conversion claims in this case.[53] The appropriate statute of limitations is the three-year statute in Tenn.Code Ann. § 47–3–118(g) which is expressly applicable to claims "for conversion of an instrument, for money had and received, or like action based on conversion."

██ The statute of limitations in Tenn. Code Ann. § 47–3–118(g) begins to run when the fiduciary or corporate employee negotiates each check. *Rodrigue v. Olin Employees Credit Union,* 406 F.3d 434, 441–44 (7th Cir.2005); *Haddad's of Ill., Inc. v. Credit Union 1 Credit Union,* 286 Ill.App.3d 1069, 222 Ill.Dec. 710, 678 N.E.2d 322, 326 (Ill.App.Ct.1997). The Tennessee Supreme Court, noting that "[n]egotiable instruments are intended to facilitate the rapid flow of commerce by providing certainty and finality in commercial transactions," has explicitly declined to apply the discovery rule to actions involving the conversion of negotiable instruments. *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 623–24 (Tenn.2002). Accordingly, the three-year statute of limitations in Tenn.Code Ann. § 47–3–118(g) bars C–Wood's claims against Wayne County bank involving checks deposited by Ms. McWilliams before June 21, 1994.[54]

**53.** The three-year statute of limitations in Tenn.Code Ann. § 47–4–111 applies to claims arising under the collection process governed by Tenn.Code Ann. §§ 47–4–101 through – 504. None of C–Wood's claims implicate these statutes. The three-year general statute of limitations for conversion claims in Tenn. Code Ann. § 28–3–105 must yield to more specifically applicable statutes of limitations like Tenn.Code Ann. § 47–3–118(g) (2001). *See Grulke v. Erickson,* 920 P.2d 845, 849–50 (Colo.Ct.App.1995); *Watseka First Nat'l Bank v. Horney,* 292 Ill.App.3d 933, 227 Ill.Dec. 19, 686 N.E.2d 1175, 1178 (Ill.App.Ct.1998); *Boyd v. C & H Transp.,* 902 S.W.2d 823, 824 (Ky.1995). The one-year statute of limitations

in Tenn.Code Ann. § 47–4–406 applies to claims based on facts that can be discovered by reviewing routine bank statements. This statute is entirely inapplicable to this case because there is no evidence in the record establishing that C–Wood could have discovered Ms. McWilliams's embezzlement simply by reviewing its monthly bank statements. These statements would not have reflected checks mailed to and received by C–Wood but never deposited in C–Wood's bank account.

**54.** C–Wood filed its complaint on June 20, 1997.

## VII.

### C–WOOD'S CLAIMS BASED ON MS. McWILLIAMS'S PRE–JULY 1, 1996 DEPOSITS

The passage of time has not barred C–Wood's conversion claims for checks deposited by Ms. McWilliams into either her or her children's accounts between June 21, 1994 and July 1, 1996. However, these claims cannot be based on Tenn.Code Ann. § 47–3–307 because that statute did not take effect until July 1, 1996. The bank's liability for conversion of the checks deposited between June 21, 1994 and July 1, 1996 must be determined based on the law as it existed prior to July 1, 1996.

■ Prior to July 1, 1996, Tenn.Code Ann. § 35–2–109 prescribed the standards for determining when a bank could be liable to a corporate payee when a corporate officer with authority to endorse and deposit checks endorsed checks payable to the corporation and deposited these checks in his personal account. As construed by the Tennessee Supreme Court, Tenn.Code Ann. § 35–2–109 and Tenn.Code Ann. § 47–3–304(2) prevent imposing liability on the bank for these transactions unless C–Wood proves that the bank was acting dishonestly or that the bank actually knew that Ms. McWilliams was breaching her fiduciary obligations when she deposited the checks into personal and not corporate accounts. *See McConnico v. Third Nat'l Bank*, 499 S.W.2d at 881–82.

The trial court, in its extensive findings of fact, did not find that Wayne County Bank was acting dishonestly or in bad faith with regard to its dealings with Ms. McWilliams or that the bank had actual knowledge that Ms. McWilliams was breaching her fiduciary obligations as a corporate officer when she endorsed and deposited checks payable to C–Wood into her personal accounts. In addition, the trial court did not find that the bank's employees could have gleaned from the checks themselves that Ms. McWilliams was breaching her fiduciary obligations to C–Wood. We have reviewed the record ourselves and can find no evidence to support such findings. Accordingly, we find that C–Wood failed to present evidence establishing Wayne County Bank's liability under both the UCC and the UFA for the checks Ms. McWilliams deposited into her personal accounts between June 21, 1994 and July 1, 1996.

## VIII.

### C–WOOD'S CLAIMS BASED ON MS. McWILLIAMS'S POST–JULY 1, 1996 DEPOSITS INTO HER PERSONAL ACCOUNTS

Unlike the pre–July 1, 1996 deposits, Wayne County Bank's liability for the post–July 1, 1996 deposits is controlled by Tenn.Code Ann. § 47–3–307. With specific application to this case, Tenn.Code Ann. § 47–3–307(b)(2)(iii) provides that "[i]n the case of an instrument payable to the represented person . . . the taker has notice of the breach of fiduciary duty if the instrument is . . . deposited to an account other than an account of the fiduciary, as such, or an account of the represented person." Takers of instruments in circumstances covered by Tenn.Code Ann. § 47–3–307(b)(2)(iii) cannot claim holder-in-due-course status. *See* Tenn.Code Ann. § 47–3–302(a)(2) (one with notice of another's claim to the instrument is not a holder in due course.)

Persons seeking to establish that a depositary bank has notice of a breach of fiduciary duty under Tenn.Code Ann. § 47–3–307(b)(2)(iii) must prove four things. First, they must prove that the instruments, in this case the checks, were taken from a fiduciary for payment or

collection or for value.[55] Second, they must prove that the depositary bank knew that the person depositing the checks was their fiduciary with regard to the checks.[56] Third, they must prove that the depositor was their fiduciary and that they are seeking to recover based on the fiduciary's breach of his or her fiduciary obligation.[57] Finally, they must prove that they are the payee of the checks that the fiduciary endorsed and then deposited in the fiduciary's personal account.

The first, third, and fourth elements of proof are easily satisfied in this case. During the time Ms. McWilliams was misappropriating C–Wood's funds, she was a fiduciary of C–Wood because she was an officer of the corporation. Tenn.Code Ann. § 47–3–307(a)(1). There is no dispute that Ms. McWilliams deposited checks payable to C–Wood into her personal accounts and that Wayne County Bank took these checks for payment or collection. There is likewise no dispute that C–Wood is seeking to recover based on Ms. McWilliams's breach of the fiduciary duties she owed as a corporate officer to C–Wood.

■ The pivotal question in this case involves the adequacy of C–Wood's evidence that Wayne County Bank knew that Ms. McWilliams was a fiduciary when she was depositing the checks payable to C–Wood into her personal accounts. For the purpose of Tenn.Code Ann. § 47–3–307(b)(ii), the bank must have actual knowledge that Ms. McWilliams was C–Wood's fiduciary when she made the deposits. Tenn.Code Ann. §§ 47–3–307 cmt.

2 and 47–1–201(25).[58] In addition, this knowledge must be possessed not just by the bank officers but also by the persons acting for the bank in the transaction. Tenn.Code Ann. §§ 47–3–307 cmts. 2 & 3 and 47–1–201(27).[59]

The evidence presented in this case establishes that the employees of Wayne County Bank accepting the deposits from Ms. McWilliams knew that she was a corporate officer of C–Wood and, therefore, that she was a fiduciary. Ms. McWilliams designated herself as a corporate officer on her handwritten endorsements which stated "C–Wood Lumber Co., Inc., by Diana McWilliams, Sec. & Treas." In addition, the bank employees receiving the deposits were sufficiently concerned about the propriety of the deposits that they called the transactions to the attention of the bank's officers and requested instructions regarding how to proceed. This conduct is consistent with the conclusion that the bank employees handling Ms. McWilliams's deposits knew that Ms. McWilliams was a corporate fiduciary when she deposited checks payable to C–Wood into personal bank accounts.

■ Determining that Wayne County Bank was not a holder in due course of the checks Ms. McWilliams deposited into her own personal accounts does not end the matter. We must still address the legal significance of the December 5, 1989 corporate resolution in which C–Wood expressly authorized Wayne County Bank to permit Ms. McWilliams to endorse checks payable to C–Wood and to deposit these

---

55. Tenn.Code Ann. § 47–3–307(b)(i).

56. Tenn.Code Ann. § 47–3–307(b)(ii).

57. Tenn.Code Ann. § 47–3–307(b)(iii).

58. *See also* 2 THE LAW OF BANK DEPOSITS ¶ 12.05[8][d], at 12–150.

59. *See also In re Broadview Lumber Co.*, 118 F.3d at 1252; *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 60 B.R. 670, 672 (Bankr.D.Haw.1986); 6 HAWKLAND § 3–307:5; WHITE AND SUMMERS § 19–5, at 272–73.

checks into her personal accounts. We have determined that this resolution authorized the bank to accept Ms. McWilliams's deposits into her personal accounts and, therefore, that the bank was acting in good faith and in a commercially reasonable manner when it accepted these deposits.

■■■■■ The execution of a signature card and corporate resolution creates a contractual relationship between a bank and its corporate customer. *Continental Cas. Co. v. Am. Nat'l Bank & Trust Co. of Chicago*, 329 Ill.App.3d 686, 263 Ill.Dec. 592, 768 N.E.2d 352, 358 (Ill.App.Ct.2002); HENRY J. BAILEY & RICHARD B. HAGEDORN, BRADY ON BANK CHECKS ¶ 11.6, at 11–10 (7th ed. 1992) ("BRADY ON BANK CHECKS"). When a depositary bank receives checks such the ones involved in this case, most courts have been quick to conclude that the bank is not acting in a commercially reasonable manner if it does not first ascertain the depositor's authority to make such a deposit.[60] One of the ways that a bank can discharge its responsibility is to consult the signature cards and corporate resolutions associated with the depositor and the payee. *Allied Ins. Ctr., Inc. v. Wauwatosa Sav. & Loan Ass'n*, 546 N.W.2d at 548 n. 7. A bank acts in good faith and in a commercially reasonable manner when it accepts a deposit in accordance with an otherwise valid corporate resolution. *Western Assurance Co. v. Star Fin. Bank of Indianapolis*, 3 F.3d 1129, 1132 (7th Cir.1993); *Kelly v. Central Bank & Trust Co. of Denver*, 794 P.2d 1037, 1044 (Colo.Ct.App.1993) (depositary bank did not act in a commercially reasonable manner when it failed to act in accordance with a corporate resolution). Thus, a broadly worded corporate resolution authorizing a bank to allow a corporate officer to endorse checks payable to the corporation and deposit them into the officer's personal account will shield the depositary bank from liability under Tenn.Code Ann. § 47–3–420. *See* 1 THE LAW OF BANK DEPOSITS ¶ 5.07[3], at 5–110 & n. 261; 2 THE LAW OF BANK DEPOSITS ¶ 12.05[6], at 12–141.[61]

The December 5, 1989 corporate resolution plainly authorizes many of the deposits at issue in this case. Despite the factual dispute regarding Larry Haggard's conversations with Ms. Sandusky regarding Ms. McWilliams's deposits,[62] the December 5, 1989 resolution, once signed, established the parties' contractual rights and obligations with regard to the deposit of checks payable to C–Wood in accounts at Wayne County Bank. Bank employees accepting deposits from Ms. McWilliams between July 1996 and September 1996

---

**60.** *See, e.g., Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 464 (D.D.C.1989); *Continental Cas. Co. v. Fifth/Third Bank*, 418 F.Supp.2d 964, 973 (N.D.Ohio 2006); *Central, Inc. v. Cache Nat'l Bank*, 748 P.2d 351, 354 (Colo.Ct.App.1987); *Al Sarena Mines, Inc. v. SouthTrust Bank of Mobile*, 548 So.2d 1356, 1360–61 (Ala.1989); *Aetna Cas. & Sur. Co. v. Hepler State Bank*, 6 Kan.App.2d 543, 630 P.2d 721, 728 (Kan.Ct.App.1981); *Allied Ins. Ctr., Inc. v. Wauwatosa Sav. & Loan Ass'n*, 200 Wis.2d 369, 546 N.W.2d 544, 548 (Wis. Ct.App.1996); BRADY ON BANK CHECKS ¶¶ 13–9, at 13–26 and 13.10; 1 THE LAW OF BANK DEPOSITS ¶ 5.07[3], at 5–109.

**61.** In fact, a depositary bank can obtain a corporate resolution after-the-fact to ratify a transaction. *Inn Foods, Inc. v. Equitable Co-Operative Bank*, 45 F.3d 594, 595–97 (1st Cir. 1995).

**62.** Mr. Haggard testified that the December 5, 1989 resolution followed a conversation with Ms. Sandusky in which she expressly authorized the bank to permit Ms. McWilliams to deposit checks payable to C–Wood into her personal account. Ms. Sandusky denied that the conversation ever occurred. The trial court found as a fact that this conversation did not occur in the context of the December 5, 1989 resolution, and we have no basis to second-guess the trial court's finding.

could appropriately point to the December 5, 1989 resolution as authoritative evidence that C–Wood had authorized Ms. McWilliams to deposit checks payable to C–Wood into her personal accounts.[63]

Ms. Sandusky's and C–Wood's after-the-fact protestations about the breadth of the December 5, 1989 corporate resolution or their lack of understanding of its scope are unavailing. Because Ms. Sandusky, as president of C–Wood, signed the resolution, both she and C–Wood are deemed to know what the resolution provided and are bound by its terms. *Beasley v. Metropolitan Life Ins. Co.,* 190 Tenn. 227, 232, 229 S.W.2d 146, 148 (1950); *Ralph v. Pipkin,* 183 S.W.3d 362, 371 (Tenn.Ct.App.2005); *Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d 351, 359 (Tenn.Ct.App.2001). Had Ms. Sandusky desired to limit the scope of Ms. McWilliams's authority, she could have done so easily. However, she opted to sign the corporate resolution provided by Wayne County Bank that gave Ms. McWilliams the same prerogatives with regard to C–Wood's checks as Ms. Sandusky herself had. As a result of Ms. Sandusky's execution of the December 5, 1989 resolution, C–Wood, not Wayne County Bank, must bear the loss resulting from Ms. McWilliams's embezzlement.

## IX.

## C–WOOD'S CLAIMS BASED ON MS. MCWILLIAMS'S POST–JULY 1, 1996 DEPOSITS INTO HER CHILDREN'S ACCOUNTS

■ The protection provided to Wayne County Bank by C–Wood's December 5, 1989 corporate resolution is not without limits. The resolution, by its own terms,

---

**63.** Throughout the course of this litigation, Wayne County Bank has argued that, in circumstances such as Ms. McWilliams's fiduciary wrongdoing, a corporate resolution will not insulate a bank from liability unless the resolution was the result of a valid inquiry into the irregularities of the circumstances. In so arguing, Wayne County Bank pointed to the line of cases including *Master Chem. Corp. v. Inkrott,* 55 Ohio St.3d 23, 563 N.E.2d 26 (Ohio 1990), and *O'Mara Enters., Inc. v. People's Bank of Weirton,* 187 W.Va. 591, 420 S.E.2d 727 (W.Va.1992) and asserted that they stood for the proposition that a standard pre-printed resolution cannot shield a bank from liability when circumstances placed the bank on inquiry notice of corporate checking irregularities. The cases state that, in an age of white-collar crime, a bank's reliance upon the corporate resolution amounts to a bad-faith attempt to circumvent its duties under the UCC. *See O'Mara Enters., Inc. v. People's Bank of Weirton,* 420 S.E.2d at 731–32. Wayne County Bank thus pinned its arguments upon its assertion that the December 1989 C–Wood corporate resolution was enacted at Wayne County Bank's insistence after the bank inquired as to the propriety of Ms. McWilliams's irregular transactions.

A closer reading of the *Master Chemical Corp.* line of cases reveals a narrower scope of responsibility placed upon banks than that articulated by Wayne County Bank. The cases concern circumstances in which corporate checks were drawn to the order of a bank. Their holdings simply reinforce the idea that banks may not treat checks drawn to their order as if the checks were bearer paper. *Master Chemical Corp. v. Inkrott,* 563 N.E.2d at 31; *O'Mara Enters., Inc. v. People's Bank of Weirton* 420 S.E.2d at 732. *See also Continental Cas. Co. v. American Nat'l Bank,* 263 Ill.Dec. 592, 768 N.E.2d at 358. Such circumstances are quite different from the facts in this case, in which Wayne County Bank was dealing with bearer paper as presented by Ms. McWilliams. Tenn.Code Ann. § 47–4–103(a) allows banks and their customers to use agreements such as corporate resolutions to vary the terms imposed by the Uniform Commercial Code. We see no reason why a bank should not be allowed rely upon the terms of a properly enacted corporate resolution when the bank is presented with bearer paper signed by an authorized corporate officer. Therefore, despite the factual dispute of the circumstances surrounding the enactment of the December 1989 C–Wood corporate resolution, Wayne County Bank was entitled to rely upon the terms of the resolution when it dealt with Ms. McWilliams's deposits into her personal accounts.

applies only to transactions in which Ms. McWilliams deposits checks payable to C–Wood into her "personal account[s]." Therefore, it provides no defense for deposits made by Ms. McWilliams to accounts other than her own.

From July 1, 1996 through September 11, 1996, Ms. McWilliams deposited checks totaling $3,302.96 into her children's accounts at Wayne County Bank. The bank was not a holder in due course with regard to these deposits because it had notice under Tenn.Code Ann. § 47–3–307(b)(2)(iii) that Ms. McWilliams was breaching her fiduciary duty to C–Wood when she made them. In addition, because the December 5, 1989 corporate resolution did not apply to these deposits, it does not provide the bank a defense against C–Wood's conversion claim. Therefore, Wayne County Bank is liable to C–Wood for $3,302.96 which represented the value of the checks that the bank took for payment or collection when it knew that Ms. McWilliams was depositing these checks in violation of her fiduciary obligation to C–Wood.

## X.

We affirm the trial court's decision denying C–Wood's claims against Wayne County Bank for the checks payable to C–Wood that Ms. McWilliams deposited into her personal accounts.[64] However, we reverse the denial of C–Wood's claims based on Ms. McWilliams's deposit of checks payable to C–Wood into her children's accounts between July 1, 1996 and September 11, 1996 and remand the case to the trial court with directions to enter an appropriate judgment against Wayne County

Bank. We tax the costs of this appeal in equal proportions to C–Wood Lumber Co., Inc and its surety and to Wayne County Bank for which execution, if necessary, may issue.

---

64. The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result. *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn.1986); *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 789 (Tenn.Ct.App.1999); *Allen v. National Bank of Newport*, 839 S.W.2d 763, 765 (Tenn. Ct.App.1992); *Clark v. Metropolitan Gov't*, 827 S.W.2d 312, 317 (Tenn.Ct.App.1991).