FILED

12/15/2017

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 21, 2017 Session

## JOSH HOLLAND, ET AL. V. EDWARD M. FORESTER, ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 12-C-1373     L. Marie Williams, Judge**

_____

### No. E2016-02147-COA-R3-CV

_____

This case involves an alleged intentional or negligent misrepresentation made in connection with the sale of a residence. Shortly after purchasing their home from sellers Edward M. Forester and Alisa S. Forester, buyers Josh Holland and Angie Holland discovered that the subfloor of the house was saturated and ruined by pet urine. The buyers sued the sellers in general sessions court. That court found that the sellers intentionally misrepresented the condition of the subfloor on the property disclosure form. The sellers appealed to the trial court. The buyers alleged that the sellers violated the Tennessee Residential Property Disclosure Act (TRPDA), Tenn. Code Ann. § 66-5-201, *et seq.* (2015). They sought damages for intentional or negligent misrepresentation; promissory fraud; fraudulent inducement to contract; and breach of the implied covenant of good faith and fair dealing.[1] Mr. Forester passed away prior to the second trial. The buyers continued this litigation but only against Ms. Forester in her individual capacity. The trial court held that the buyers failed to prove that Ms. Forester had knowledge of the alleged defect in the subfloor. Specifically crediting her trial testimony, the court held that Ms. Forester did not violate the TRPDA or make an intentional or negligent misrepresentation. The buyers appeal, asserting that the trial court erred in determining that Ms. Forester did not know about the condition of the subfloor and in admitting Ms. Forester's testimony regarding Mr. Forester's mental capacity around the time of the general sessions court trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

---

[1] The buyers also alleged that the sellers violated the Tennessee Consumer Protection Act. The trial court dismissed this claim because the sellers were not engaged in the business of selling real estate at the time of the sale. The buyers did not appeal this ruling.

1

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

John R. Anderson and Joseph W. Dickson, Chattanooga, Tennessee, for the appellants, Josh Holland and Angie Holland.

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellee, Alisa S. Forester.

**OPINION**

**I.**

The sellers placed their property on the market in November of 2011. They separated as a couple in January of 2012 and later divorced. Ms. Forester moved out and did not reside in the home thereafter. The buyers visited and looked at the house twice before deciding to purchase it. The husband and wife buyers each testified that the house smelled strongly of cigarette smoke the first time they toured the home. After receiving feedback from their realtor regarding the smell, the sellers took the house off the market, cleaned it thoroughly, and used air freshener throughout the home before placing it back for sale. The buyers testified that on their second visit, the house smelled strongly of air freshener and deodorizer, with some lingering smoke smell. The buyers did not observe any pet odor in the home prior to closing. They planned to remove the smoke smell after closing by painting the walls and replacing the carpet with a free floating hardwood floor, which could be installed over a particle board subflooring.

The parties settled on a purchase price of $179,900. As part of the closing process, the sellers executed a Tennessee Residential Property Condition Disclosure form on February 22, 2012, pursuant to the TRPDA, Tenn. Code Ann. § 66-5-202. A place on the disclosure form asked "Are you (seller) aware of any defects/malfunctions in any of the following?" One item under that question was "floors," with the option of marking "yes," "no," or "unknown." The sellers marked "no." The buyers signed the disclosure statement on March 10, 2012.

On March 19, 2012, Jim Boston, a licensed home inspector, conducted a professional property inspection of the home. Boston noted the condition of the floors in the interior family rooms and bedrooms to be satisfactory. He did note that the entry door to the right front bedroom was "damaged by a pet" and needed replacement. He also observed minor signs of moisture seepage along one of the basement walls, but no signs of moisture or other pet damage to the main floors of the house.

2

The closing occurred on April 20, 2012. The night before closing, the buyers did a final walkthrough and observed the condition of the house. The buyers did not reenter the house until April 22, 2012, three days after their final visit before closing. In early May, the buyers began to paint and repair the house, including removing the carpets on the main level, with assistance from Mr. Holland's father and both of Ms. Holland's parents. The buyers discovered that the particle board subflooring had been severely saturated, stained, and smelled strongly of, presumably, pet urine.

When the buyers saw the condition of the subfloor, they called inspector Boston and asked him to return to the house for a second inspection and assessment of the subfloor. Boston's second inspection report, dated May 5, 2012, states that

> [w]hen the carpeting and padding were removed you found extensive damage to the wooden subfloor. It appears that this was caused by urine from the sellers' pets. It is obvious that this had to occur over a period of several years. The subflooring was still wet today from the urine. Since the subfloor is particle board it is also deteriorating as the wooden fibers are separating. None of the subfloor appears to be salvageable. All of the subflooring and some of the baseboards will need to be removed and replaced. The floor joists and framing underneath should also be inspected and repaired or replaced as needed. Any damaged or molded insulation underneath the flooring should also be removed and replaced.

The buyers and their parents removed and replaced the subflooring, doing the work themselves. Mr. Holland estimated that the project required about ninety hours of individual labor. The buyers incurred roughly $1,830 in cost of materials and other expenses.

The buyers sued the sellers in general sessions court, alleging that they knew of and intentionally misrepresented the condition of the subfloor on the disclosure form. Ms. Forester did not testify at the general sessions court trial. Mr. Forester did testify. He said that they owned dogs and cats that were inside animals while living in the house. He said the pets had accidents in the home. Mr. Forester testified further that the sellers had the carpet replaced about seven or eight years before his testimony in 2012. He testified that the subflooring was stained when he had the carpet replaced, but that there were never any structural weaknesses of any kind. He did not recall whether the subfloor was wet at the time. He stated that the "gentleman who laid the carpet down" did not say anything about the subfloor being so damaged that he should not put carpet down on it

without repairing it.  Mr. Forester testified that he did not indicate any defects in the floors on the property disclosure form because

> [w]ell, I lived there and walked on that carpet and floor for 20-something years or almost 20 years.  It never sagged, never bounced, never bucked up.  Wasn't damaged as far as I'm concerned.  It was livable.

Mr. Forester did not believe that the particle board staining was a defect.  Regarding the smell, Mr. Forester testified that there was no odor of pet urine and "that smoke odor was the big concern."

The general sessions court held that the sellers made a willful misrepresentation.  The court awarded damages of $23,487.73 to the buyers.  The general sessions court found that Mr. Forester knew that there were stains when he had the carpet replaced and knew that there were problems with their pets having accidents in the house before it was sold to the buyers.

The sellers appealed to the trial court.  Mr. Forester passed away before the second trial took place.  The buyers proceeded against Ms. Forester individually.  The parties stipulated that the transcript from the general sessions court trial was admissible and that "there is not an issue as to the credibility of witnesses from that trial as represented here by that transcript."  The entire trial transcript and the exhibits admitted in general sessions court were entered into evidence in accordance with this stipulation.

The only two witnesses who testified at the trial court were Donald Tindell, a real estate appraiser, and Ms. Forester.  She admitted that she and Mr. Forester had owned pets while they lived in the house.  She stated that she had a small, eleven-pound inside dog that was house-trained for the majority of the time that it was in the home.  She believed the buyers mentioned a smoke and pet smell during their first tour of the home to her real estate agent before she and Mr. Forester cleaned the home and placed it back on the market.  Ms. Forester stated that the carpet in some rooms had been replaced probably three years before they sold the house.  When asked whether it had been replaced seven or eight years before the sale, she stated that the carpet was replaced "probably five" years ago.  She testified that she was not present when the carpet was replaced, that she had not seen the subfloors at that time, and that the first time she was made aware of any issue with an alleged defect with the flooring was "after we sold the house and all this started."

The trial court held that there was no violation of the TRPDA, no negligent or intentional misrepresentation, and "no knowledge held by Mrs. Forester as a sufficient

4

basis for any of the claims made in this lawsuit." The court found that "Mrs. Forester made an excellent witness." The court also found

> credible Mrs. Forester's testimony that her husband's brain cancer was diagnosed within a month of his testifying in General Sessions Court and that she had observed problems with his mental functioning. He had to leave work because he could not recall how to do his job as a Chattanooga police officer.

The court noted that "[t]he plaintiffs must prove the fraud allegations by clear and convincing evidence and must prove the misrepresentation and statutory violation allegations by a preponderance of the evidence." The court found that

> the proof Mrs. Forester had actual knowledge of a defect arising out of pet urine in the house or that she should have known of that defect [was] based only on circumstantial evidence. That circumstantial evidence is the condition of the floor which was detected when the carpet was removed. The Court finds Mrs. Forester's direct testimony more credible than the circumstantial evidence to the contrary. There is no direct evidence whatsoever that Mrs. Forester knew of any condition of the floor at issue which could be considered a defect. The Court finds the smoke odor which camouflaged the pet smell condition about which the plaintiffs now complain would have camouflaged the condition while the Foresters lived in the house also.

As a result, the trial court dismissed the buyers' claims. They timely filed a notice of appeal.

## II.

The issues on appeal are (1) whether the evidence preponderates against the trial court's finding, based in substantial part on its credibility determination, that Ms. Forester did not violate the TRPDA, or make an intentional or negligent misrepresentation, because she was unaware of the defect in the house; and (2) whether the trial court erred in considering Ms. Forester's testimony about Mr. Forester's mental capacity around the time of his general sessions court hearing.

5

## III.

We review the trial court's findings of fact de novo upon the record of the trial court with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). The presumption of correctness of the trial court's findings requires us to affirm the trial court's findings of fact unless we determine that the aggregate weight of the evidence indicates that a different fact is more likely to be true. *See C-Wood Lumber Co. v. Wayne Cnty. Bank*, 233 S.W.3d 263, 272 (Tenn. Ct. App. 2007). The trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Haynes v. Lunsford*, No. E2015-01686-COA-R3-CV, 2017 WL 446987, at *3 (Tenn. Ct. App., filed Feb. 2, 2017); *Orndorff v. Calahan*, No. M2007-02060-COA-R3-CV, 2008 WL 4613546, at *5 (Tenn. Ct. App., filed Oct. 9, 2008).

## IV.

The buyers allege that Ms. Forester violated the TRPDA, Tenn. Code Ann. § 66-5-201, *et seq.* They also assert related claims of fraud and misrepresentation. All of these claims arise from the allegation of Ms. Forester's intentional or negligent misrepresentation on the TRPDA disclosure form.

The TRPDA requires an owner to either disclose in good faith any known material defects regarding the condition of a property, or state to a buyer that "the owner makes no representations or warranties as to the condition of the real property or any improvements thereon and that purchaser will be receiving the real property 'as is.' " Tenn. Code Ann. § 66-5-202. The TRPDA contains an "actual knowledge" requirement providing as follows in pertinent part:

> (a) The owner shall not be liable for any error, inaccuracy or omission of any information delivered pursuant to this part if:
>
> (1) The error, inaccuracy or omission was not within the actual knowledge of the owner . . .

*Id.* § 66-5-204(a). The statute further provides that a buyer who was aware of a defect before the earlier of closing or occupancy cannot recover for damages suffered as a result of the defect. *Id.* § 66-5-208(a)(1).

At the close of proof, the trial court clarified an important point in the following discussion:

6

THE COURT: Am I accurate in my recollection that no estate [for Mr. Forester] was opened? I seem to remember that from our motion for substitution.

[Defense counsel]: I don't believe there was, Your Honor.

THE COURT: And she was substituted in his place or did we just proceed against her only?

[Plaintiffs' counsel]: We filed against both of them in Sessions Court, Your Honor.

THE COURT: There were lot of procedural –

[Plaintiffs' counsel]: I think at this point with no estate, I don't know that she is substituted for him. I think she is the only defendant left.

THE COURT: *She is the sole defendant, and it is not an imputation situation*?

[Plaintiffs' counsel]: *Right*.

THE COURT: I just want to be clear on that. They were sued as separate parties. He is now deceased. *There is no claim surviving as to him, and she is sued as an individual party*.

[Plaintiffs' counsel]: *That's correct*.

(Emphasis added.) As can be seen, the trial court specifically asked whether it was an "imputation situation," and the buyer's counsel confirmed that it was not. Thus, the buyers cannot recover unless they have shown Ms. Forester's independent knowledge of the defective subflooring.

Ms. Forester testified that she had no knowledge of the subflooring defect until after the house was sold. She stated as follows:

Q: If you recall, was it you or was it Mr. Forester who made arrangements to have the carpet replaced?

A: It was Mr. Forester.

7

Q: That was sort of a division of labor?

A: That was his deal, yes.

Q: And in the area where these problems that we have been talking about occurred or existed, were you present when the old carpet was taken up or between the time the old carpet was taken up and new carpet put down?

A: I was not. I was at work.

Q: You came home from work one day and it had been completed?

A: Correct.

Q: Did you ever see the entire time you lived there the flooring or subflooring, the particle board that was under those carpets?

A: No, not anywhere on the upstairs floor. The only part that I was privy to was the downstairs where we replaced the yellow shag in.

Q: That was on top of concrete, so that wasn't a subfloor?

A: That's correct.

Q: When did you first become aware that the [buyers] believed there was a problem with the subflooring in that house?

A: After we sold the house and all this started.

Q: That was your first notice of any defect?

A: That's correct.

There is no proof in the record contradicting Ms. Forester's testimony that she never saw the subfloor. All of the proof indicates that the subflooring defect was not detectable

8

either by looking at, or walking on, the carpet in the affected areas. The home inspector's initial inspection and report failed to reveal any problem with the flooring.

Regarding the smell in the house, both buyers testified that they did not detect a pet urine smell during their visits and inspections before they bought the property. Mr. Holland testified:

> Q: How many times did you view this house prior to signing a contract?
>
> A: Two.
>
> Q: Did you notice any urine smells during that time?
>
> A: Not urine smells. Cigarette odor on the first inspection or the first walkthrough, and then the second one was just like air freshener and stuff.

Ms. Holland's testimony was more emphatic. She stated as follows:

> Q: [D]id you also inspect this house in terms of walking through and looking at this house prior to entering into a contract?
>
> A: Yes, sir.
>
> Q: Did you notice any pet odors in the house at that time?
>
> A: Not at all.
>
> Q : Did you tell anybody that you thought there was pet urine in that house?
>
> A: Definitely not.
>
> Q: Did you tell your Realtor that?
>
> A: Definitely not.
>
> Q: Did you have any indication of any other odor or the like in the house?

A:  Yes.  The first time we walked through, it smelled heavily of smoke.  The second time we walked through, it smelled heavily of smoke and Febreze.

Q:  Neither time did you smell any pet urine?

A:  Definitely not.

Q: Did you see any evidence of pet urine?

A: No.

The buyers point to Ms. Forester's testimony that their real estate agent reported to the sellers that the buyers had observed "a smoke smell and a pet smell in the house." The real estate agent did not testify, however.  As quoted above, both buyers' testimony directly contradicts this assertion.  The evidence does not preponderate against the trial court's finding that "the smoke odor which camouflaged the pet smell condition about which the plaintiffs now complain would have camouflaged the condition while the [sellers] lived in the house also."

As already stated, the trial court specifically credited Ms. Forester's testimony that she had no knowledge of the subflooring defect until after the property sale.  We afford great deference to the trial court's determinations of witness credibility.  *Haynes*, 2017 WL 446987, at \*3 (citing *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011)).  We will not reevaluate the trial court's assessment of witness credibility unless there is clear and convincing evidence to the contrary.  *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).  There is not clear and convincing evidence in the record sufficient to overturn the trial court's finding that Ms. Forester did not know about the defective subflooring in this case.

The buyers argue that the trial court erred in admitting and considering Ms. Forester's testimony regarding Mr. Forester's mental capacity during the general sessions trial.  At the beginning of the circuit court trial, the parties stipulated that the general sessions trial transcript was admissible.  The buyers' counsel stated that "part of the stipulation is the parties' agreement that there is not an issue as to the credibility of witnesses from that trial as represented here by that transcript."  Ms. Forester was allowed to testify before the trial court that Mr. Forester was diagnosed with brain cancer shortly after his general sessions court testimony.  She also stated that he "was having problems at that point coming in and out of reality."  To the extent that Ms. Forester's testimony was an attempt to challenge the veracity or competency of Mr. Forester's prior testimony, the trial court should have disallowed it, in light of the parties' stipulation.

10

But we hold that any error in this regard was harmless, because even accepting all of Mr. Forester's testimony as competent and true, it has very little bearing on the dispositive issue before the trial court – the knowledge of Ms. Forester about the subflooring defect. Mr. Forester stated that the sellers had indoor pets which at times had accidents in the house. Nothing else Mr. Forester said supports the conclusion that his then-wife knew about the condition of the subflooring. Thus, any error in allowing Ms. Forester to testify about his mental condition was harmless under the circumstances.

## V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellants, Josh Holland and Angie Holland. This case is remanded to the trial court for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE